[No. 6,635.—In Bank.]

## ESTATE OF WILLIAM C. HINCKLEY.

TRUSTS FOR CHARITABLE PURPOSES—CONSTRUCTION OF CONSTITUTION—PUBLIC POLICY.—Trusts for perpetual charitable uses are not in conflict with public policy as declared in the Constitution of the State.

ID.—ID.—PERPETUITIES—DEFINITION.—The perpetuities prohibited by the common law (and referred to in the Constitution) do not include trusts for charitable uses.

ID.—CHARITY—CONSTRUCTION OF CODE—PERPETUITIES.—Charities are not prohibited by the provisions of the Civil Code (§§ 715, 772) which prohibit perpetuities.

ID.—ID.—ID.—ID.—TRUSTS.—Perpetual trusts for charitable purposes "when relating to real property" are not prohibited by title ii, part iv of the Civil Code.

ID.—ID.—ID.—ID.—ID.—CESTUIS QUE TRUSTENT.—Section 2221 of the Civil Code does not require that the individual *cestuis que trustent* to be ultimately benefited by a devise or bequest of charity, shall be specified in the instrument creating the trust.

ID.—ID.—ID.—ID.—ID.—Section 1313 of the Civil Code contains no reference to the provisions of the Code guarding against perpetuities or defining certain trusts, and this silence may be treated as an implied legislative construction of those provisions.

ID.—ID.—ID.—ID.—ID.—No statute of this State has prohibited permanent settlements to charitable uses.

ID.—ID.—ID.—ID.—ID.—CASES EXPLAINED.—The New York decisions upon the subject of charitable trusts are dependent upon the Statutes of that State.

ID.—ID.—ID.—ID.—ID.—The Virginia cases upon the same subject do not turn upon the Statutes of that State prohibiting alienations or defining trusts, but upon the broader principle that independent of the Statute of 43 Elizabeth, the Courts of Equity can not establish charitable trusts when no legal estate vests, and the trust is so vague that its benefits can not be claimed by the *cestuis que trustent*.

ID.—ID.—ID.—ID.—ID.—STATUTE OF 43 ELIZABETH CASES COMMENTED UPON.—Cases in the Supreme Court of the United States, and in the courts of the several states, upon the subject of the jurisdiction of the Court of Chancery in England over charitable trusts prior to the Statute of Elizabeth, commented upon.

ID.—ID.—ID.—ID.—ID.—ID.—JURISDICTION—COURTS.—Courts of Equity in this State have jurisdiction, derived from the English common law, independent of the Statute of Elizabeth, to establish and enforce charities, when trustees competent to take the legal estate are named, and the class to be benefited, and the individuals to be designated by the trustees, are capable of ascertainment.

ID.—ID.—ID.—ID.—ID.—ID.—ID.—CONSTRUCTION OF CONSTITUTION—ENGLISH COMMON LAW—DEFINITION.—The Statute of Elizabeth has neither been adopted nor in terms repealed by the Legislature of this State.

The system of procedure provided in it is totally inapplicable to our social or political condition, but the English Court of Chancery has long abandoned the machinery of that Statute, and a jurisdiction as to the remedy has been established independent of, and, in a certain sense, without reference to the Statute. This equity jurisdiction had been established many years before the adoption of the Constitution, and it would seem that the jurisdiction of our Courts of Equity is to be tested by reference to the jurisdiction actually exercised by the Court of Chancery in England when our Constitution was adopted, except so far as the employment of such jurisdiction may conflict with provisions of the present Constitution, or with the Constitution of the United States, or is inapplicable—the genius of our institutions being considered. Therefore even if the Court of Chancery in England were limited to the enforcement as charities of trusts for such purposes as are enumerated in the Statute of Elizabeth, the Court of Equity in California would possess as ample judicial power with respect to such charities as the English Chancery, except where restricted by the Constitution.

ID.—ID.—ID.—ID.—ID.—ID.—CHARITY—BENEVOLENT—DEFINITION—MAXIMS.—In England the word "*charity*" has acquired a settled technical meaning by reference to the objects enumerated in the preamble of the Statute of Elizabeth—a meaning less extended than that accorded to "*benevolent*" and other words of similar import; and a devise or bequest, if for "*charity*" generally, is held valid, but if for benevolent or other similar objects it is held void; and so also it is held void if for charitable purposes, and also for purposes of an indefinite character which are not charitable, as if, for instance, a bequest is made for such charitable or other purposes as the trustee shall think fit. But where the word used is limited by being associated with other words more clearly pointing to a strictly charitable disposition of the fund, it would seem that the principle does not apply. Therefore, a trust in favor of "*human beneficence*" and "*charity*" may be valid in view of the context.

ID.—ID.—ID.—ID.—ID.—ID.—CY PRES—PREROGATIVE.—There is a distinction between the *cy pres* as a prerogative and as a judicial power, and in the general devolution upon the Courts of this State of all judicial power with respect to charities is included the power of *cy pres*, so far as the same may be employed in directing trustees named in a will or deed to carry into effect the general, lawful, and charitable intent when the particular scheme is impracticable or has become unlawful; and it is immaterial how uncertain, indefinite, and vague are the *cestuis que trustent* or final beneficiaries, provided a general, lawful, and charitable intent is apparent, and there is a legal mode of rendering the beneficiary certain by means of trustees.

ID.—ID.—ID.—ID.—ID.—ID.—CONSTRUCTION OF WILL OR DEED.—The courts look with favor upon all attempted charitable donations, and will endeavor to carry them into effect if it can be done consistently with the rules of law.

ID.—ID.—ID.—ID.—ID.—Under § 1313 of the Civil Code, one third of a testator's "*distributable assets*" (that is, one third of the estate after payment of debts, etc.) may be devised or bequeathed to charitable uses.

ID.—ID.—ID.—ID.—ID.—JURISDICTION OF PROBATE COURT.—Under our system it is the necessary province of a Probate Court to inquire and de-

termine whether a valid trust has been created. The mode of administering, the power to regulate and direct its subsequent administration, is quite separate and distinct from a question of whether a legal trust has been expressed.

ID.—ID.—ID.—ID.—ID.—ID.—*Held*, accordingly—upon an appeal from an order of distribution assigning to the trustees named in the will of the testator the property devised to them—that the bequest set out in the opinion of the Court was valid, subject to the limitation that it should not exceed one third of the distributable assets of the testator; and that if the Probate Court had not the machinery for ascertaining these values, it might distribute the property to the trustees, to hold the legal title to an undivided interest in the property equal to one third of the distributable assets, and the remainder, if any, in trust for heir.

APPEAL from a judgment of distribution in the Probate Court of the City and County of San Francisco. MYRICK, J.

*William Barber*, for Appellant, on rehearing.

It is conceded in the opinion of this Court, filed on the 14th day of April last, that the provisions of the will, in respect to the charitable trust which the testator attempted to establish, create a perpetuity. (Civ. Code, §§ 715, 716, 771, 870; *Levy* v. *Levy*, 33 N. Y. 133; *Beekman* v. *People*, 27 Barb. 306; Lewis on Perpetuities (689), Law Library, vol. 42.) The law of this State, at the time when the will took effect, prohibited the creation of perpetuities for any purpose whatever. The Constitution of 1849, article xi, § 16, prohibits perpetuities, except for eleemosynary purposes. This prohibition left the Legislature at liberty to declare whether eleemosynary perpetuities should be allowed or not. (*People* v. *Bigler*, 5 Cal. 23, 26; *People* v. *Rogers*, 13 id. 159; *Hobart* v. *Supervisors*, 17 id. 23; *S. & V. R. R. Co.* v. *City of Stockton*, 41 id. 161; Cooley Const. Lim. (168) 204, 4th ed.) The Legislature has absolutely forbidden perpetuities in all cases, without exception. (Civ. Code, §§ 715, 716, 771, 870.) If this legislation did not apply to charitable perpetuities, it was useless, for the Constitution had already prohibited all non-charitable perpetuities. Our law against perpetuities is substantially, and almost literally, a transcript from the Revised Statutes of New York. (Compare 1 N. Y. Rev. Stat. 718, *723, §§ 14–16, or 4 Kent's Com. 280, *271, with §§ 715, 716, of our Civil Code. Section 771 of our Civil Code affirms the prin-

ciple declared in *Hawley* v. *James*, 5 Paige, 318, 445; S..C., 16
Wend. 163, 164; and *Belmont* v. *O'Brien*, 12 N. Y. 402.)   At
the time of the adoption into our Civil Code of the provisions
of the New York Revised Statutes, above referred to, respect-
ing perpetuities, it was the well-settled construction of those
provisions, that perpetuities for charitable purposes were
thereby prohibited.   (*Ayres* v. *Methodist Church*, 3 Sandf.
371, 372; *Yates* v. *Yates*, 9 Barb. 344, 347; *Levy* v. *Levy*, 33
N. Y. 129; *Bascom* v. *Albertson*, 34 id. 614, 620; *Adams* v.
*Perry*, 43 id., foot of 498, 500; *Holmes* v. *Mead*, 52 id. 339;
*King* v. *Rundle*, 15 Barb. 144; *Beekman* v. *People*, 27 id.
foot of 305; *Wilson* v. *Lynt*, 30 id. 128; *Ruth* v. *Oberbrun-
ner*, 40 Wis. 257, 262, the New York statute having been
adopted in Wisconsin; see also *Dashiell* v. *Attorney-General*,
5 Har. & J. 392; S. C., 9 Am. Dec. 572; S. C., 6 Har. &
J. 1.)   The provisions of the New York Revised Statutes,
above referred to, having been substantially adopted in our
Civil Code, must be deemed to have been so adopted with
the construction they had then received in the State of
their origin.   (*Wiesner* v. *Zoun*, 39 Wis. 219; *Tyler* v. *Tyler*,
19 Ill. 151; *Grattan* v. *Grattan*, 18 id. 170; *Streeter* v. *People*,
69 id. 598; *Kilkelly* v. *State*, 43 Wis. 607; *Greiner* v. *Klein*,
28 Mich. top 22; *Harrison* v. *Sager*, 27 id. foot 478; *Myrick*
v. *Hasey*, 27 Me. 17; *Pangborn* v. *Westlake*, 36 Iowa, 549;
*Pennock* v. *Sellers*, 2 Pet. 1, 17 (18); *Adams* v. *Field's Ex'r*,
21 Vt. 266; *People* v. *Webb*, 38 Cal. 477.)   An additional rea-
son for holding gifts to charity in perpetuity to be null and
void, is found in the fact that hostility to perpetuities is the
declared policy of this State.   (Const. 1849, art. iv, § 31,
Const. 1879, art. xii, § 1; Civ. Code, §§ 283, 290, 360, 1275;
compare *Bascom* v. *Albertson*, 34 N. Y. 612–614; *Levy* v.
*Levy*, 33 id. 116–122; 3 Sandf. 375, 376; *Andrews* v. *Bible
Society*, 4 id. 180, 184; *Beekman* v. *People*, 27 Barb. 309, last
paragraph.)   If any individual in California desires to found
a charity, the law interposes no obstacle to the execution of
his benevolent intentions.   By section 286 of the Civil Code, a
corporation may be formed for any purpose for which individ-
uals may lawfully associate themselves.   By section 354, subd.
4, corporations may purchase, hold, and convey such real and
personal property as the purposes of the corporation may re-

quire, subject to certain legal limitations. By section 1275, corporations formed for scientific, literary, or solely educational purposes, may take by will, as may also charitable and benevolent societies, subject to the provisions of section 1313. Under these provisions, corporations may be formed for any charitable purpose, and may, subject to the prescribed legal limitations, accept such gifts of property by grant or devise, as any one may be disposed to make them; and thus, though the charity can not in terms be made perpetual, it will be administered as long as the duration of the existence of the corporation. And as the corporation does not hold the property technically in trust, but holds it absolutely, to be used of course in conformity with the declared purpose of its organization, the laws regulating the tenure of trust property do not apply to the case. (*Wetmore* v. *Parker*, 52 N. Y. 459; *Levy* v. *Levy*, 33 id. 117.) The same purpose is apparent in the law of New York and in the law of California, in respect to charitable trusts. In the one State as well as in the other, a gift or conveyance to trustees for any charitable purpose, is subject to the provisions of the general law of trusts, and to the prohibitions of the law against perpetuities. In either State, gifts, conveyances, or bequests, subject to certain legal limitations, may be made to charitable corporations; and no trust, in the technical sense of the term, is thereby created. The reason why gifts to corporations organized for charitable purposes should be encouraged rather than gifts to private individuals in trust for charity, is so fully explained in the citations from the New York reports in (7) of this brief, as to render any further suggestions on that point unnecessary. The provisions of our law of uses and trusts in respect to real estate, are also borrowed, with some slight modifications not affecting any question raised in this case, from the Revised Statutes of New York. Since the passage of the Revised Statute of New York, we find that in that State all classes of trust in respect to real property are tested by the statute just cited, and held invalid unless they fall within one of the four classes of designated trusts. Charitable trusts form no exception to this rule. (*Levy* v. *Levy*, 33 N. Y. 134; *Bascom* v. *Albertson*, 34 id. 584, 615, 619; *Clemens* v. *Clemens*, 37 id. 76; *Adams* v. *Perry*, 43

id. 496; *Holmes* v. *Mead*, 52 id. 338; *Yates* v. *Yates*, 9 Barb. 324; *King* v. *Rundle*, 15 id. 145; *Voorhees* v. *Presb. Ch.*, 17 id. 105; *McCaughal* v. *Ryan*, 27 id. 387, 388, 402–404; *Beekman* v. *People*, id. 308, 309; *Wilson* v. *Lynt*, 30 id. 128, 130.) The same rule prevails in Wisconsin, where the New York Statute has been substantially adopted. (*Ruth* v. *Oberbrunner*, 40 Wis. 238, 257.) It is obvious that the charitable trust which the testator attempted to create, does not fall within any of the classes of trusts designated in and sanctioned by section 857 of our Civil Code; and as our statute, like that of New York, permits only those trusts which it designates and enumerates, the attempted trust is null and void. (*Levy* v. *Levy*, 33 N. Y. 129.) The doctrines of the case of *Williams* v. *Williams* were never received with favor by the judiciary of New York, *McCaughal* v. *Ryan*, 27 Barb. 387; *Beekman* v. *People*, id. 275; *Wilson* v. *Lynt*, 30 id. 130; *Matter of Abbott*, 3 Redf. 305; *Levy* v. *Levy*, 33 N. Y. 107, 119, 121, 129; *Bascom* v. *Albertson*, 34 id. 589, foot of 590, 613–618, and cases cited in (11) of this brief, and were overruled by the Court of Appeals as soon as an opportunity was offered for a re-examination of them by that tribunal. The purpose and beneficiary of the attempted trust now in question, are not declared with "reasonable certainty." It is difficult to conceive anything more uncertain than the declared purpose of the trust, and as to the beneficiaries, none whatever are indicated. The trust must be so certain and definite in its character, that the Court can see to its execution. (*Wheeler* v. *Smith*, 9 How. U. S. 80; *Goddard* v. *Pomeroy*, 36 Barb. 548, 555; *Gallego's Ex'rs* v. *Att'y-Gen'l*, 3 Leigh, 487; S. C., 24 Am. Dec. 650; Opinion of Tucker, J.; *Levy* v. *Levy*, 33 N. Y. 98, 101, 115; *Bascom* v. *Albertson*, 34 id. 586, 591–595; *Matter of Abbott*, 3 Redf. 305; *Lefevre* v. *Lefevre*, 2 T. & C., N. Y. Sup. Ct. 341; *Bridges* v. *Pleasants*, 4 Ired. Eq. 26; *White* v. *Att'y-Gen'l*, 4 id. 19; *Heiss*, *Ex'r*, v. *Murphy*, 40 Wis. 276; *Norris* v. *Thomas*, 4 C. E. Green, 308; S. C., 5 id. 522; *Phelps* v. *Phelps*, 28 Barb. 151; *Phelps* v. *Pond*, 23 N. Y. 77; *Owens* v. *Miss. Soc.*, 14 id. 408; *Lepage* v. *McNamara*, 5 Iowa, 124; *Grimes*, *Ex'r*, v. *Harmon*, 35 Ind. 221–226; *Wilderman* v. *Mayor*, 8 Md. 551; *Needles* v. *Martin*, 33 id. 614; *Beale* v.

*Deane*, 25 Ga. 441, 444.) The intended trust is therefore void:

1. Because it violates the law of this State against perpetuities. 2. Because it does not fall under any class of trusts permitted by the law of this State. 3. Because it does not express with reasonable certainty, either the objects or the beneficiaries of the trust.

Before section 1313 was enacted the Civil Code had declared that property should not be held in perpetuity, and there is nothing in that section to overcome the effect of this prohibition. To say that the Legislature can not prohibit perpetual charitable trusts without thereby necessarily prohibiting all charitable trusts, or that if it authorizes the creation of any charitable trusts, such charitable trust is necessarily perpetual, is to assert a proposition sustained neither by reason nor authority. (See *Ayres* v. *Meth. Ch.*, 3 Sandf. foot 375 ; *Mc-Caughal* v. *Ryan*, 27 Barb. foot 383, 401 ; *Wilson* v. *Lynt*, 30 id. foot 129.) For an explanation of the term "charitable uses" (a common law phrase) in connection with the term trust we must look to the common law, as the Code is silent on the point. (*U. S.* v. *Jones*, 3 Wash. C. C. R., 215 ; *McCool* v. *Smith*, 1 Black, U. S., 458, 459 ; *State* v. *Smith*, 5 Humph. 392 ; *Ex parte Hall*, 1 Pick. 261 ; *State* v. *Mace*, 5 Md. 337; *Adams* v. *Turrentine*, 8 Ired. 147 ; *U. S.* v. *Magill*, 1 Wash., C. C. R., 463 ; *Ex parte Vincent*, 26 Ala. 145 ; *Apple* v. *Apple*, 1 Head, Tenn., 348; *Neville* v. *State*, 7 Cold, Tenn., 86; 1 Kent's Com. *462 ; *Brewer* v. *Blougher*, 14 Pet. 198.) "Charitable uses" are those designated in the 43d Elizabeth, chap. 4, or such as have been held to be within the equity of that statute. (Story's Eq. Jur., § 1155 ; Bacon's Abridg., vol. 2, 192 ; 1 Spence Eq. Jur., *589–*592; Perry on Trusts, § 692.) There are in fact no "charitable uses" designated in the will in question. The trust is void because it is not restricted to purposes which the law holds charitable, but includes those which are within the range of "human beneficence ;" an expression of so indefinite a character, that it vitiates the trust, by rendering it impossible for the Court to direct its execution. (Shelford on Mortmain, 82–89 ; see Law Library, vol. 20; 2 Story Eq. Jur., §§ 1155, 1158 ; Perry on Trusts, § 711; *Brown* v. *Yeall*, 7 Ves. 50; *Carne* v. *Long*, 63

Eng. Ch. 76; *Thomson* v. *Shakspeare*, 1 De G. F. & J. 399.)
It is therefore submitted that a trust whereby a fund is dedi-
cated *inter alia* to " human beneficence," is not " a trust for
charitable uses." But even if it were conceded that the
alleged trust could have been executed, had the case arisen in
England, it does not by any means follow that it can be en-
forced by any Court in this State. Indefinite charitable trusts
are enforced in England by holding that a gift, devise, or be-
quest to trustees, in trust for " charity," or for " such charita-
ble purposes as they shall see fit," is good to divest the title of
the grantor and vest it in the trustees—for such charitable
purpose, however, as the Chancellor, and not the trustees,
shall see fit to designate. For examples of this practice, see
*Attorney-General* v. *Herrick*, 2 Amb. 712; *Wellbeloved* v.
*Jones*, 1 Sim. & S. 40; S. C., 1 Eng. Ch. 41; *Supple* v. *Low-
son*, id. 729; *Cary* v. *Abbot*, 7 Ves. Jr. 495; *Baker* v. *Sutton*,
1 Keen, 224; *Attorney-General* v. *Buller*, 1 Jac. 407; *Peacock*
v. *Attorney-General*, L. R., 3 Ch. D. 342, top 349; *Attorney-
General* v. *Guise*, 2 Vern. 266; *Beekman* v. *People*, 27 Barb.
296; Story Eq. Jur. § 1170, citing *Attorney-General* v. *Pea-
cock*, Finch, 245.) So that the Chancellor, as remarked in
*Wellbeloved* v. *Jones*, above cited, " secures the objects of the
testator by the creation of a proper and permanent trust," or, as
the Master of the Rolls says in *Cary* v. *Abbot*, also cited above,
we are to make him (the giver) charitable in our way and upon
our principles." In Story Eq. Jur., § 1190, an attempt is made
to state the distinction between the two classes of indefinite
charitable trusts, which determines whether the administra-
tion of the charity shall be by the Chancellor directly, or, un-
der the sign manual, as representing the King, in the capacity
of *parens patriœ*. But in whichever capacity the Chancellor
acts in the administration of indefinite charities, he exercises
a power not judicial in its character. Suppose one testator
bequeaths a sum of money "to charity;" and that another be-
queaths a like sum to trustees " for charity;" or " for such
charitable purposes as they shall see fit." The Chancellor,
representing the King and acting under the sign manual, dis-
poses of the former bequest, perhaps, by directing the money
to be paid over to the " Royal Humane Society." He disposes
of the other bequest, as Chancellor, perhaps by a precisely

similar direction, or by awarding the fund to some other designated charitable institution. Now, can it be contended that there is anything judicial in the disposition of either of these legacies, or in the one more than in the other ? The only mode of reconciling the English doctrine of gifts in trust for charitable purposes, with the treatment of such trusts in England, is by holding that such gifts are good as against the donor and those claiming under him, but that the trust is void ; yet that in such cases the Sovereign, as *parens patriæ*, will, through his Chancellor, acting under the sign manual or otherwise, devote the property to some purpose which the law recognizes as charitable. (See Story Eq. Jur., §§ 1165–1168 ; *Cary* v. *Abbot*, 7 Ves. 495 ; *Morice* v. *Bishop of Durham*, 9 Ves. 399.)

The power thus exercised by the Chancellor in creating a specific charitable trust, where the trust declared is either illegal or indefinite, is known in England as the *cy pres* power. (1 Jarman on Wills (217), new ed. 244; *Beekman* v. *People*, 27 Barb. 291.) And has been repeatedly held to be an administrative power, and not a judicial power. (*Moore* v. *Moore*, 4 Dana, Ky., 366 ; *Bascom* v. *Albertson*, 34 N. Y. 594 ; *Wheeler Smith*, 9 How., U. S., 80; *Grimes, Ex'r*, v. *Harmon*, 35 Ind. 233, 247, 248 ; *Williams* v. *Williams*, 4 Seld. 548 ; *Beekman* v. *Bonsor*, 23 N. Y. 298, 308, 311 ; *Beekman* v. *People*, 27 Barb. 294–304; *Levy* v. *Levy*, 33 N. Y. 115 ; *Beall* v. *Deane*, 25 Ga. 441; *Gallego* v. *Attorney-General*, 3 Leigh, 487; S. C., 24 Am. Dec. 650; *Andrew* v. *Bible Society*, 4 Sandf. 161, 178; *White* v. *Fish*, 22 Conn. 54; *Heiss, Executor*, v. *Murphy*, 40 Wis. 276, 292 ; see also the discussions in the *Ironmongers' case*, 10 Clark & F. 908, 916; id., 1 Craig & Phil. 227. The trust is also void, because it includes the subject of religion. A trust in favor of religion is not a trust for charitable uses. The erection of a church to be used by those only who contribute to its support, may be a dedication of the property to religion; but this is not charity. "Pious uses" are not neceessarily charitable uses. It is only where the church is a part of the State that indefinite trusts for the support of "religion" are held good, and in such cases religion is held to mean the doctrine and ritual of the established church.

(See *Attorney-General* v. *Pearson*, 3 Mer. 409.) This Court has
no means of determining judicially what "religion" is, and,
consequently, it has no means of controlling the execution of
the trust. Buddhism, Brahminism, Mormonism, Agnosticism,
Spiritualism, are not all understood in common parlance to be
forms of religion. (See *Levy* v. *Levy*, 33 N. Y. 115; *Mc-
Caughal* v. *Ryan*, 27 Barb. 405; *Grimes, Ex'r*, v. *Harmon*, 35
Ind. 210.) "Unless," says Duer, J., in *Andrew* v. *Bible etc.
Society*, 4 Sandf. 181, "all uses that may be denominated
pious shall be subjected to the same rule as other trusts, we
shall find no escape from this alternative; either all uses for
a religious purpose, whether the religion which they are in-
tended to aid be true or false, rational or absurd, must be up-
held and enforced; or the uses connected with a particular
form of religion must be selected as the special objects of
favor and encouragement." The Statute of 43 Elizabeth, so
far as it could be adopted in this State consistently with its
obviously inapplicable limitations, and with the power of our
Courts, acting solely in a judicial capacity, to enforce it as
construed and enforced by the English Chancellors, was prob-
ably adopted in this State in 1850 as a part of the common law
of England. So far as it permitted trusts in perpetuity for
charity, it was abrogated by section 715 of the Civil Code. So
far as it permitted trusts of real property other than those spe-
cified in section 857 of the Civil Code, it was abrogated by that
section in connection with section 847. So far as it permitted
vague and indefinite trusts, with no specific object and no des-
ignated beneficiary, it was abrogated by sections 852 and 2221
of the same code. The effect of the statutory modification al-
ready referred to, was to eliminate the Statute 43 Elizabeth
altogether from our legal system, except so far as in the des-
ignation and enumeration of "charitable uses," it served as a
codification of the pre-existing common law, or of so much of
it as the English Parliament saw fit to retain. (See Perry on
Trusts, § 696; Story Eq. Jur., § 1158; *Levy* v. *Levy*, 33 N. Y.
107; *Owens* v. *Miss'y Soc.*, 14 N. Y., foot of 409; *Adye* v.
*Smith*, 44 Conn. 62; *Taylor* v. *Keep*, 2 Bradwell, Ill., 368;
*Williams* v. *Williams*, 4 Seld. 548; *Norris* v. *Thompson*, 4 C.
E. Green, 307.) The purpose and effect of section 1313, so far
as it concerns private trustees for charitable uses, was not to

increase but to restrict their powers.   The attempted charitable trust should be declared void, and the decree should be modified so as to distribute to the residuary legatee, what the testator designates as "the remaining part of the California Theater Property."   (Fol. 13.)

1. The trust creates a perpetuity.  2. It does not fall within any of the classes of trusts permitted by our law.  3. It designates no beneficiary, and does not express with reasonable certainty the object of the trust.   Who can appear as plaintiff to enforce it ?  4. It is not "a trust for charitable uses," inasmuch as it includes purposes which the law does not hold to be "charitable," within the well-known legal signification of that term.   Besides, it is quite consistent with the terms used that the income should be doled out in mere almsgiving and private charity.   This is not "charity" in the legal sense. (*Ommaney* v. *Butcher*, 1 Turn. & R. 260; 11 Eng. Ch. 144, foot of 152–153.)   5. If not "a trust for charitable uses" then it is void, even at common law as well as by our statutes, both for uncertainty and because it creates a perpetuity.  6. Such a trust can only be enforced by the exercise of a power not judicial in its nature.  7. No trust which may require in the course of its administration, a judicial determination as to what is "religion," can be held valid in this State.

*Stephen H. Phillips* and *Lloyd Baldwin*, for Respondents.

McKINSTRY, J. :

William C. Hinckley, a citizen of California and resident of the City and County of San Francisco, died in that city and county on the 11th day of April, 1876.

On the 29th day of December, 1875, he had executed and published his last will and testament, which contained the following clauses :

"1. I give the property known as the California Theater property, being the property now subject to a lease to H. P. Wakelee, of the City of San Francisco aforesaid, which said lease is recorded in the Registry of Deeds at said San Francisco, liber 28, Leases, page 172, to which reference is had for a more complete description, and which said property is leased to said H. P. Wakelee for a term of years, and which lease is

a part of the conditions under which this bequest is made, together with all rights which move to me or my heirs and assigns under or by virtue of such said lease [*William C. Hinckley, W. H. Chickering, witness*] to the following persons, my fellow-citizens and members of the First Unitarian Society of San Francisco aforesaid, viz.: Horatio Stebbins, C. Adolphe Low, Horace Davis, George C. Hickox, Stephen H. Phillips, Frank H. Woods, Louis H. Bonestell, Charles A. Murdock and John C. Merrill—nevertheless in trust for the following purposes:

" To pay to my relatives hereinafter named, that is to say, to John Campbell, James Campbell, Ebenezer Campbell, Francis H. Campbell, Jane Kennedy, Susan Pierce, Emily Jones, Elizabeth Samson, Mary Chapman, Fanny Badger, Susan G. Young, Robert H. Hinckley, Thomas H. Hinckley, George A. Hinckley, and Abby E. Hinckley three thousand dollars each from the income of the said property under the lease aforesaid, or from the capital amount paid by the lessees under said lease for the property, if said lessees choose so to pay it according to the terms of said lease. [*Wm. C. Hinckley, W. H. Chickering, witness.*]

" And I desire that these bequests be paid as soon as may be after my decease.

" After the payment of these bequests as herein provided, the remaining part of the California Theater property, either under the lease, or in capital amount paid by the lessees, as the case may be, shall be devoted to the establishment of a perpetual fund, to be called ' The William and Alice Hinckley Fund,' the income of this fund to be devoted perpetually to Human Beneficence and Charity. And while I do not wish to set arbitrary limits to the wisdom, faithfulness, and discretion of my trustees, desiring, as I do, to foster Religion, Learning, and Charity, I wish to call their attention to the trials and afflictions of the industrious, striving, unfortunate poor, and especially to the aged, the infirm, and the lonely. I wish also to show my interest in good learning, and my sympathy [*Wm. C. Hinckley and W. H. Chickering, witness*] with honorable and striving young men, to set apart from the income of this fund the sum of Three Hundred Dollars per annum, to be known and designated as ' The Hinckley Scholarship,'

to be given to some worthy, talented, industrious, and needy young man, who is pursuing liberal studies, either in the University of the State, or in any other school, as the trustees shall name.

" 3. It is my will that when any vacancy occurs in the Board of Trustees mentioned in the first clause of my will, by death, resignation, or removal from the city, or separation from the aforesaid religious society, that the vacancy shall be filled by ballot, in an election duty notified, in which election each of the trustees of the said religious society, and each of the trustees of this fund shall be entitled to one vote; but no person shall cast more than one vote by reason of being a member of the Board of Trustees of the said religious society, and also one of the trustees of the aforesaid fund.

" I also desire that the trustees of this fund report annually its [*Wm. C. Hinckley and W. H. Chickering, witness*] condition, and their doings under this, my will, to the trustees of said religious society.

" 4. I appoint the persons already named as trustees to 'be my executors, and expressly provide that no bonds shall be required of them, or any of them, and request them to pay all my just debts, and to attend my funeral as my bearers, and to let all things pertaining to my burial be done with the simplicity that accords with my feelings.

" Finally, I dedicate this fund established by this will in my own name and in the name of my beloved wife to the interests of Religion, Learning, and Charity; and I desire by it to express my sympathy with my fellow-men, and my humble faith in God, the Father and Friend of all.   [*Wm. C. Hinckley. W. H. Chickering, witness.*]"

The question to be considered is the validity of the foregoing provisions, in so far as they do not relate to specific legacies to relatives of the decedent.

It is contended, on the part of the appellant, that the clauses above recited are in conflict with the policy of this State, as declared in the Constitution; that they are contrary to, and are rendered illegal by, the provisions of the Civil Code, which prohibit perpetuities, contrary to the chapter which relates to trusts, and to a section under the head of Trustees; that the trusts therein named can not be enforced,

because the statute 43 Elizabeth, c. 2, has never been adopted in this State, and neither the act adopting the common law, nor the provision of the Constitution giving jurisdiction in "all equity cases," confers upon any Court in this State the peculiar jurisdiction with respect to charities exercised by the English Court of Chancery. It is further urged that the trusts could not be enforced in England, or, if so, only by employing the *cy pres* power, a power which it is claimed can not be resorted to by any Court of this State.

On the part of the respondent it is contended that the trust may be established and enforced by a Court of Equity in California, as a "charity;" that it was the duty of the Probate Court to decree the "Theater property" to the trustees— whether the attempt to establish a charity was or was not valid—since the trust to pay the legacies was good; and that one third of all the property of a decedent may be devised to charitable uses. (Civ. Code, § 1313.)

We shall assume that the aforementioned propositions are necessarily involved. They have all been elaborately argued.

A learned writer has said: "The rule against perpetuities has been gradually established by judicial decisions, and affords a most notable instance of the nice adaptation of the principles of common law to the decision of a question which requires at once a due regard for the rights of persons and property, and a careful consideration of those larger principles of public policy so essential to the welfare of communities and states. For public policy is opposed to the perpetual settlement of property in families in such manner that it is forever inalienable, or inalienable so long as there may be a person to take answering the designation of some testator who may have died generations before. The first stand of the judges was to allow only those limitations which would take effect at the end of one life from the death of the testator. This was afterwards modified to include two or more lives in being, and running at the same time, ' or where the candles are all burning at once;' for it is plain that such a space of time is only one life in being—that of the longest liver. The next step was much debated; but it was finally settled that an executory devise might be made to vest at the end of lives in being and twenty-one years after, to allow for infancy

of the next taker, who by reason of infancy could not alienate the estate.   The statute of 10 and 11 Wm. III., c. 16, having provided that children *en ventre sa mère*, born after their father's death, should for the purposes of the limitations of estates be deemed to have been born in his lifetime, a further extension of nine or ten months was allowed for the period of gestation.   The next step was to allow a period of nine months for gestation at the beginning of the term, as the life in being during which the term would run might be that of a child *en ventre sa mère.*   *   *   *   It was finally determined that twenty-one years might be allowed as a term in gross, without reference to the infancy of any person, but that the period of nine months for gestation should be allowed in cases only where the gestation had commenced of some person who, if born, would take an interest in the estate. By such steps, by imperceptible degrees, and after two centuries of doubt and litigation, and unaided by legislation, the Judges framed and completed *the great rule against perpetuities.*   Thus all future estates which arise by way of executory devise, conditional limitation, or shifting and springing uses, must vest within a life or lives in being at the death of the testator, and twenty-one years; and, in case the person in whom the estate or interest should then vest is *en ventre sa mère,* nine months more will be allowed; and all estates created as aforesaid, and so limited that they may not vest within that time, are void."   (Perry on Trusts, §§ 379, 380.)

I. Trusts for perpetual charitable uses are not in conflict with public policy as declared in the Constitution of the State.

On the 13th day of April, 1850, the Legislature of California enacted: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all the Courts of this State." (Stats. 1850, 219; see Political Code, § 4468.)

"The great rule against perpetuities" had been settled in England before the date of the "Declaration of Independence" by the Colonies, before the first Constitution of California was adopted, and before the act above recited was passed.   That rule—at all events the whole of it except that

portion which allowed nine months for an infant *en ventre sa mère*—became part of the law of California, at least from the date of the act adopting the common law of England " as the rule of decision."

Prior to the adoption of the common law " as a rule of decision," the people of this State had declared in the Constitution : " No perpetuities shall be allowed except for eleemosynary purposes." (Const. of 1849, art. xi, § 16.) This provision was renewed in the Constitution of 1879. (Art. xx, § 9.) It can not seriously be contended that this provision of the Constitution either prevents the Legislature from shortening the period within which estates must vest, or from making the law thus shortening such period applicable to trusts for charitable uses. In the absence of any legislation adopting the common law, it is probable that the courts of this State would go to the common law definitions to ascertain the meaning of the expression " no perpetuities shall be allowed," as used in the Constitution. However this may be, immediately upon the adoption of the common law, it became necessary to construe the language of the Constitution, as being simply declaratory of the common law rule. The exception " for eleemosynary purposes" can not be held to enlarge the meaning of the prohibitory clause which preceeds it. The exception seems to have been added lest the words " no perpetuities shall be allowed" might possible be held to include perpetual charities. In a certain sense trusts for charities may be perpetuities, since they are not required to be limited as provided by the rule against perpetuities. But the perpetuities prohibited by the common law did not include trusts for charitable uses. It is a correct exposition of the rule of the common law to declare that by it " perpetuities are prohibited ;" yet no legal mind would receive this as a declaration that trusts for charitable uses, although created to continue beyond the period fixed by the common law rule, were prohibited. We must suppose that the framers of the Constitution were familiar with the rule. If they had simply declared—" no perpetuities shall be allowed," the Courts would not have held the prohibition to have extended to charities, because the framers of the Constitution used the words of prohibition in view of the evils which the English

Courts had sought to correct by the establishment of the rule, and in view of the effect and extent of the rule itself. The Constitution did not adopt a new rule, but expressly recognized one already existing elsewhere. The words of the exception, so far from indicating that it was the intention of those who made and adopted the Constitution to extend the prohibition to charities—or that charities should be considered as perpetuities within the meaning of the rule of prohibition—indicate precisely the contrary. In short, the Constitution adopted the common law rule, which never applied to charities, and is to be read as if it had been said: "Perpetuities shall not be allowed, but let it be clearly understood that settlements for charitable uses are not perpetuities within the meaning of the word as used in the prohibitory clause."

The adoption of the common law left undisturbed the distinction recognized by the Constitution between prohibited perpetuities (including private trusts) and charities.

That the prohibition of the common law and Constitution —as also that of any statute merely shortening the period within which, according to the rule of the common law, estates must vest—extends as well to the creation of perpetuities through the medium of private trusts as by common law conveyances, can not be doubted. A "perpetuity"—that is, that which is prohibited as such by the common law or statute—will no more be tolerated when it is covered by a trust than when it displays itself undisguised in the form of a legal estate. (Perry on Trusts, 737, and cases cited; *Thelluson* v. *Woodford*, 4 Ves. 227; S. C., 11 id. 112; *Hooper* v. *Hooper*, 9 Cush. 122; *Hawley* v. *James*, 5 Paige, 445.)

II. "Charities" are not prohibited by the provisions of the Civil Code which prohibit perpetuities.

As we have seen, *charities* are not included in the common law rule. It remains to inquire whether the rule prohibiting perpetuities has been extended to include charities by express statutory enactment.

Section 715 of the Civil Code reads: "The absolute power of alienation can not be suspended, by any limitation or condition whatever, for a longer period than during the continuance of lives of persons in being at the creation of the limitation or

condition, except in the single case mentioned in section 772."
Section 772 thus referred to is : "A contingent remainder in fee
may be created on a prior remainder in fee, to take effect in
the event that the persons to whom the first remainder in fee
is limited die under the age of twenty-one years, or upon any
other contingency by which the estate of such persons may
be determined before they attain majority."

It is difficult to believe but, had it been the intention that
these sections should apply to trusts for charitable uses, they
would have been differently worded, or that there would have
been inserted an independent section clearly expressing such
intention. The sections of the code prohibit limitations or
conditions which may suspend the power of alienation be-
yond the *lives of persons.* Bearing in mind the object of the
common law rule—to prevent the perpetual settlement of
property in families—it would seem to be the evident purpose
of the provisions of the Code, which limit the period within
which estates must vest during the existence of *living per-
sons,* simply to shorten that period as established by the com-
mon law. Accepting this as the real intent of the statute,
full force and effect is given to the language employed; and
the rule of the statute, like that of the common law, may co-
exist with and leave undisturbed the doctrines of the common
law applicable to charities. We acknowledge the power of
the Legislature to declare a different public policy, if, in the
progress of our history, the perpetuation of trusts for charita-
ble uses shall be found in any degree to conflict with the de-
velopment of free institutions. But when, as is now the
case, a wise and sufficient purpose can be attributed to the
legislation which has been adopted, and the language em-
ployed does not necessarily import a larger purpose, we ought
not assume that it was the intent entirely to overthrow a
policy so thoroughly established and widely recognized. The
statute simply recognizes principles of public policy—"essen-
tial to the welfare of communities"—which prohibit the per-
petual settlement of estates in individuals and families. The
common law rule as to perpetuities does not apply to chari-
ties. "When either from circumstances extrinsic to a limita-
tion or from the character of its subject-matter, a sufficient
guaranty exists against any violation of the spirit of the law

for the prevention of remoteness, their force and applicability, with respect to such limitation, cease so far as concerns the necessity for expressly conforming to the period prescribed by law. This consideration seems to apply to limitations * * * to charitable uses." (Lewis on Perpetuities, 663; *State* v. *Griffith,* 2 Del. Ch. 399.)

Still, bearing in mind the evil which it was the object of the common law rule to prevent, the remarks of Taylor, C. J., in *Griffin* v. *Graham,* 1 Hawks, 130; S. C., 9 Am. Dec. 619, will tend to illustrate the meaning of the provisions of the Civil Code, so far as they are applicable to real property. The learned Chief Justice said: "The meaning which the law annexes to this term (perpetuity) is that of an estate-tail, so settled that it can not be undone or made void. As when, if all parties who have an interest join, they can not bar or pass the estate; but if by the concurrence of all having the estate-tail it may be barred, it is not a perpetuity. It is in reference to estates-tail that the word is used in the Bill of Rights; for there was no other estate that had a tendency that way. A condition not to alien annexed to a fee simple is void; and the rules relative to executory devises, by which their duration is limited, had effectually checked their tendency to a perpetuity. In obedience to the declaration in the Bill of Rights, and to the injunction in the Constitution, the Legislature of 1784 abolished entails—giving as a reason that they tended to raise the wealth and importance of particular families, and to give them an undue influence in a republic. This shows plainly that they designed to prevent the accumulation of individual wealth, and did not contemplate the possibility of any evil likely to arise from the establishment of a permanent fund for charitable uses. The probable effect of this was the reverse of what they meant to guard against, as it promised to increase the equality of the republic. It would afford the means of instruction to those who could not otherwise procure them; it would diffuse knowledge and morality among the class of society which stands most in need of them, and, by rendering them useful and efficient members, add to the strength and happiness of the community. Assuredly, then, property applied to these ends never entered into the common law notion of perpetuity; otherwise the objection would have

been taken in *Porter's Case*, 1 Coke, 22, and in many others to be found in the books, where similar dispositions have been made.   \*   \*   \*   I am thus led to conclude, that a perpetuity which the law would deem void, must be an estate so settled for *private uses* that, by the very terms of its creation, there is no *potestas alienandi* in the owner."

In other States, where the Constitution prohibits perpetuities; or where legislation has been had, adopting the common law rule, or shortening the common law period within which estates must vest, it has not been supposed that such statutes interfered with the right to make perpetual settlements for charitable uses.   Thus in *Alabama* it was provided, that gifts to others than wife and children must vest within the term of three lives in being, and ten years thereafter.   (Code 1852, § 1309.)   Yet the Supreme Court of that State, in 1862, held the doctrine to be settled that the Chancery Court had jurisdiction, by virtue of its original common law powers, without claiming prerogative powers, and without the aid of the statute of 43 Elizabeth, to uphold an executory bequest of money to the "Pilgrims' Rest Association," "to be loaned out by Commissioners to be appointed by said association," etc.   (*Williams* v. *Pearson*, 38 Ala. 299.)

In Connecticut it would appear that a Colonial statute of 1702 gave perpetuity to public charities.   (*Treat's Appeal*, 30 Conn. 115.)

By statute of Michigan, the absolute power of alienation can not be suspended for a longer period than the continuance of two lives in being, with an exception like that found in section 772 of our Civil Code.   (Com. Laws, 1857, c. 85, §§ 15–26.) In *Attorney-General* v. *Soule*, 28 Mich. 153, it was held that a bequest "for the establishment of a school at Montrose" was so uncertain as not to bind the trustees to the application of the fund to public charity, and therefore no case was presented for interference by the *State*.   But while the doctrine of charitable uses was considered and discussed, there was no suggestion by court or counsel that the statute prohibited perpetual charities.   In *Ohio* (2 Rev. Stats., c. 42, § 1) no estate can be limited to any person or persons, except they are in being, or the immediate descendants of such as are in be-

ing at the time of making the deed or will. In Ohio the
general principles of the law of charities, as understood in
England, have been repeatedly enforced, without any intima-
tion that they were limited or controlled by any statutory
prohibition of perpetuities. (*Zanesville C. & M. Co.* v. *Zanes-
ville*, 20 Ohio, 483; *McIntyre* v. *Zanesville*, 17 Ohio St. 352;
*Williams* v. *First Presb. Soc.*, 1 id. 501.)   By the nineteenth
section of the " Declaration of Rights" in the Constitution of
Arkansas, adopted in 1836, it is declared, " Perpetuities and
monopolies are contrary to the genius of a republic, and shall
not be allowed." Nevertheless the Supreme Court of that
State has said: " It is not against public policy, or the spirit of
our laws, for a man to donate to trustees a lot of ground, to
be held and appropriated by them and their successors in per-
petuity, for the use and benefit of a religious denomination as
a place of worship." (*Grissom* v. *Hill*, 17 Ark. 488.)  In Ken-
tucky a statute has substantially adopted the common law
rule against perpetuities. (Rev. Stat., c. 80, § 34.)  Yet it has
there been held that the Court of Chancery possesses the
powers of chancery in England, even such as are in the nature
of prerogative. (*Att'y-Gen.* v. *Wallace*, 7 B. Mon. 611.)  This
goes further than it is necessary to go in the present case, but
certainly the *statute* could not have been considered as affect-
ing the question.   In Iowa, alienation can not be suspended
for a period longer than lives in being and twenty-one years.
(Code 1851, p. 1191.)  But in *Johnson* v. *Mayne*, 4 Iowa, 180,
and *Miller* v. *Chittenden*, id. 252, the Supreme Court seem to
recognize the English law of charities, including the doctrine
of *cy pres* so far as it is a *judicial* doctrine. In Vermont, where,
as in Arkansas, the Constitution declares that a perpetuity
shall not be allowed, it was considered, although the question
to its full extent was not involved, that the Court of Chan-
cery had full jurisdiction with reference to charitable bequests
and uses.   (*Executors of Burr* v. *Smith*, 7 Vt. 241; S. C., 29
Am. Dec. 154.)  In *Paschal* v. *Acklin*, 27 Tex. 173, it was
expressly held that bequests to charitable uses were not
within the constitutional prohibition of perpetuities and en-
tailments.

III. Such perpetual trusts, "when relating to real prop-

erty," are not prohibited by title iv of part 2 of the Civil Code.

It is urged, however, that trusts for charitable uses arising out of real property, are prohibited by title iv of part 2 of the Civil Code. Section 847 declares: "Uses and trusts, in relation to real property, are those only which are specified in this title." And section 857 reads: "Express trusts may be created for any of the following purposes:

"1. To sell real property and apply or dispose of the proceeds in accordance with the instrument creating the trust.

"2. To mortgage or lease real property for the benefit of annuitants or other legatees, or for the purpose of satisfying any charge thereon.

"3. To receive the rents and profits of real property, and to pay them to or apply them to the use of any person, whether ascertained at the time of the creation of the trust or not, for himself or for his family, during the life of such person or for any shorter term, subject to the rules of title ii of this part.

"4. To receive the rents and profits of real property, and to accumulate the same for the purposes and within the limits prescribed by the same title."

It may not be improper here to ascertain what is intended by the third and fourth subdivisions of the section just quoted.

A section of the New York statute, which was before the codifiers in this State, read as follows:

"Express trusts may be created for any or either of the following purposes:

"1. To sell land for the benefit of creditors.

"2. To sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon.

"3. To receive the rents and profits of lands, and apply them to the education and support, or either, of any person, during the life of such person, or for any shorter term, *subject to the rules prescribed in* the first article of this title.

"4. To receive the rents and profits of lands, and to accumulate the same, for the purposes and within the limits prescribed in the first article of this title." (Rev. Stats., ed. 1829, p. 728.)

Comparing the section of the New York statute with the corresponding section of our Civil Code, we find: 1. Prior to the amendments of 1874, the first subdivision of the section read like the New York law; and the second subdivision was substantially the same. 2. That the third subdivision of the New York statute has been changed by inserting the words "pay them to," "whether ascertained at the time of the trust or not," and "for himself or his family."

None of the changes have altered the meaning of the third subdivision of the section. It had already been held that a trust to receive the profits of land, and "to pay them over" to the beneficiary, was valid under the provision authorizing a trustee to receive such profits "and apply them to the use" of any person. (*Leggett* v. *Perkins*, 2 N. Y. 297.) It had also been held, where there was a trustee "to receive rents and profits, and apply them to the use of *any person*," that if the person primarily designated, died during a trust term lawfully constituted in respect to its duration, there was nothing in the terms or policy of the statute which prevented the use from being shifted to some other object of the testator's bounty—although such last person should not be in existence or known at the creation of the trust. (*Gilman* v. *Reddington*, 24 N. Y. 13.) And it had been further decided that any application of rents and profits, by way of trust, to the use of a man's family, was an application of them to *his* use, and if confined to the period of his life, and to a living individual, was not contrary to the statute. (*Rogers* v. *Tilley*, 20 Barb. 639.)

The section of the New York statute above recited (§ 55) is found in article second, of title two, of chapter one of "An act concerning the acquisition, etc., of property," etc. (Rev. Stats. p. 717.) The reference in the third and fourth subdivisions are distinctly to the first article of the same title.

The fifteenth and sixteenth sections of the first article, thus referred to, are:

"15. The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate, except in the single case mentioned in the next section." "16. A contin-

gent remainder in fee may be created on a prior remainder in fee," etc., (continuing in the same language as that employed in section 772 of our Civil Code.) These are followed by other sections regulating and declaring the mode in which estates may be limited, none of which authorize an extension of the power of alienation beyond the periods mentioned in sections 15 and 16.

Section 37 of the " First Article" to which reference is made in the 55th section of the New York statute is·like section 724 of the Civil Code of California, with the difference that the New York law applies only to accumulations of the rents arising out of real estate, while section 724 relates also to the profits derived from personal property.

Section 724 of the Civil Code reads:

" An accumulation of the income of property for the benefit of one or more persons, may be directed by any will or transfer in writing sufficient to pass the property out of which the fund is to arise, as follows:

1. If such accumulation is directed to commence on the creation of the interest out of which the income is to arise, it must be made for the benefit of one or more minors then in being, and terminate at the expiration of their minority; or,

2. If such accumulation is directed to commence at any time subsequent to the creation of the interest out of which the income is to arise, it must commence within the time in this title permitted for the vesting of future interests, and during the minority of the beneficiaries, and terminate at the expiration of such minority."

The references in subdivisions three and four of section 55 of the New York statute point unmistakably to the provisions of law which prescribe the rules to which the subdivisions are subject; that in the third subdivision being aimed at sections 15 and 16 of article first, which prohibit perpetuities; and that in the fourth subdivision, at section 37 of the same article—which prohibits the accumulation of the rents and profits of real estate.

The New York statutes have been always thus construed. The third and fourth subdivisions of section 55 have been read, by the Courts of that State, in connection with the sec-

tions of article first, prohibitory of perpetuities and accumulations. (*Downing* v. *Marshall*, 23 N. Y. 366; *Lang* v. *Ropke*, 5 Sandf. 363; *Rogers* v. *Tilley*, 20 Barb. 639.)

The reference in subdivision three of section 857 of our Civil Code to "the rules of title two of this part"—part two—is sufficiently clear and is applicable to the rules found in that chapter which relate to the creation of estates. It may indeed be made to include section 715, which, although it takes its place in title two of the *first* part, is referred to in section 771—a section of title two of part *two*. Section 771 is to be read with section 715, and was inserted from abundant caution lest it might be held that the latter section could be avoided, and a perpetuity created, by simply authorizing a change in the character of the property constituting the subject of the trust. Section 771 is merely declaratory of the law as laid down in *Hawley* v. *James*, 5 Paige, 444; S. C., 16 Wend. 163. "A mere power to exchange lands, whether such exchange is made directly, or by means of a sale and new purchase, is not a power to alien the estate, within the intent and meaning of the provisions of the Revised Statutes on this subject." (*Hawley* v. *James*, 5 Paige, 444.) Consequently such power would not obviate the objection as to alienability, within the rule against perpetuities. (*Belmont* v. *O'Brien*, 12 N. Y. 402.)

But the reference to title two of part two in the *fourth* subdivision of section 857 of the Civil Code, is evidently a *mistake*. There is nothing in the title which in terms treats of accumulations of the rents and profits of real estate. The reference is to provisions which relate to accumulations of income from real estate, and it can be given force and effect by applying it to sections 722–726, in title two of the *first* part —the only sections which contain the law on that subject, and which prohibit accumulations of income arising from real or personal property.

In thus construing section 857 of the Civil Code, our purpose has been broader than to point out an erroneous reference. It has included a design to prove that section 847 is applicable only to private trusts, and does not prevent the creation of permanent trusts for charitable uses. The references in section 857 are to provisions of the code, which, as

we have seen, manifestly relate to the creation of estates to vest in persons or individuals in being, and to the accumulation of income for the benefit of such persons. Except so far as section 757 still further limits the period during which beneficial interests may be enjoyed, the title which treats of uses and trusts is but suppletory and correlative to the provisions of the code which relate to the creation of legal estates not violative of the rule against perpetuities. What has been said with reference to the object of the common law and statutory rule prohibiting the vesting of legal estates beyond a certain period—the prevention of the dangerous enhancement of the wealth, power, and influence of particular individuals and families—applies equally to equitable estates or interests. We must assume that the Legislature had this object in view. We ought not to construe a statute, in which no direct reference is made to so important a subject as charitable trusts, as intended to prohibit charities; against which can be urged none of the objections, so pregnant of evil, which have been made against permanent settlements in families. Besides, section 715 is included within part one of the code which treats of "property in general," and, as we have seen, has no application to trusts for charitable uses. Here, as in New York, "trusts in personal estate are subject to no statutory restriction; in other words, the Legislature has never attempted to define and enumerate the lawful occasions for such trusts." (*Gilman* v. *Reddington*, 24 N. Y. 12.) They stand, therefore, as at the common law, subject only to the statutory rule of section 715, and to the direction against accumulations. (§§ 724, 2220.) It would be a strange condition of the law, if while we could uphold a charitable donation of personal property—the income to be perpetually applied to the support of the charity—we must declare void a devise to a like object, upon the ground that the latter is annulled by the provisions of the code which, it is claimed, prohibit such uses and trusts. Of property thus dedicated, one kind is as effectually withdrawn from ordinary business as another; and there is nothing in our general policy or laws which attaches a peculiar sanctity to land, or which either encourages or forbids restraints upon its alienation, not applicable to money or other property.

IV. Nor does section 2221 of the Civil Code require that the individual *cestuis que trustent,* to be ultimately benefited by a devise or bequest to charity, shall be specified in the instrument creating the trust.

It is further objected that the trusts which the will attempts to establish do not comply with section 2221 of the Civil Code. The section is:

"Subject to the provisions of section 852, a voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor, indicating with reasonable certainty:

"1. An intention on the part of the trustor to create a trust; and,

"2. The subject, purpose, and *beneficiary* of the trust."

It is said that this section applies to all trusts alike.

The code does not in terms declare the distinction between express and implied or resulting trusts. But section 857 declares that "express trusts" in relation to real property may be created for certain purposes. Express trusts are put in opposition to those which are implied or resulting—the latter being such as exist "by operation of law," and the former such as are created or declared by instrument in writing. (§ 852.) Section 2221 is found in a chapter which treats of "Trusts" in general. The first section of the chapter divides trusts into "voluntary" and "involuntary." (§ 2215.) Section 2221 is "subject to" section 852—that is to say—if a voluntary trust (using the words in the sense of the code) relates to *land,* it must be in writing. All trusts relating to personal property are left by the section to be proved "by any words or acts of the trustor"—that is, by oral testimony. A bequest to charitable uses can only be by will in writing. It follows necessarily that section 2221 was not intended to apply to such, or any, bequests, or to devises for charitable uses.

Section 2221 does not purport to limit the cases in which trusts may be created. It lays down a rule of *evidence.* Section 2220 declares:

"A trust may be created for any purpose for which a contract may lawfully be made, except as otherwise prescribed by the titles on uses and trusts and on transfers."

As we have seen, the title on uses and trusts does not prohibit charities, and "transfers" are conveyances of title from one living person to another. (§ 1039.)

V. Section 1313 of the Civil Code—its effect.

The conclusion which we have reached with reference to the statutory provisions above considered is strengthened by section 1313 of the Civil Code. "No estate, real or personal, shall be bequeathed or devised to any charitable or benevolent society, or corporation, or to any person or persons in trust for charitable uses, except the same be done by will duly executed at least thirty days before the decease of the testator; and, if so made at least thirty days prior to such death, such devise or legacy, and each of them shall be valid; provided, that no such devises or bequests shall collectively exceed one third of the estate of the testator leaving legal heirs, and in such case a *pro rata* deduction from such devises or bequests shall be made so as to reduce the aggregate thereof to one third of such estate; and all dispositions of property made contrary hereto shall be void, and go to the residuary legatee or devisee, next of kin, or heirs, according to law."

If the sections of the code relating to the period within which estates must vest or be beneficially enjoyed were clearly applicable to devises and bequests for charitable uses, it might plausibly be urged that section 1313 was intended only to impose a further limitation upon the powers of testators. In such case section 1313 might be said to mean that no bequest or devise for charitable uses should be valid (even for the period during which the power of alienation may be suspended), unless by will executed more than thirty days before the death of the testator. But surely, in the absence of language making the provisions of the code relating to perpetuities clearly applicable to charities, much force should be given to the declaration of section 1313. It is there said that if a will settling real or personal property to charitable uses shall be made *more* than thirty days prior to the death of the testator, the devise or bequest *shall be valid.* We have seen the references in the title treating of uses and trusts to title two of part first, and title two of part second, and in the chapter treating of trustees to the provisions relating to uses and trusts and to transfers. It is worthy of observation that sec-

tion 1313 contains no reference to the provisions of the code guarding against perpetuities or defining certain trusts. Nothing would seem more natural than that such provisions would have been referred to in section 1313, if the Legislature had supposed that they had any bearing upon the matter of trusts for charitable uses. Under the circumstances, the very silence of section 1313 may be treated as an implied legislative construction of the sections which are not referred to.

Section 1313 of the Civil Code, like the statute of George II., c. 36, commonly called the mortmain act, recognizes the right to convey or settle to charitable uses, and was passed to prevent *improvident* alienations or dispositions, by languishing or dying persons, to the disherison of their lawful heirs. (See preamble to Statute Geo. II.)

We conclude that no statute of this State has prohibited permanent settlements to charitable uses.

VI. New York decisions dependent upon statutes of that State.

In New York it was indeed held that a clause in a will, whereby was created a trust to executors to receive the rents and profits of real estate, and to pay them to certain named societies, during the lives of individuals named, was invalid, because not constituted as required by the section 55 of the New York statute above cited. (*Downing* v. *Marshall*, 23 N. Y. 379.) It was decided that, by the third subdivision of that section, the trust must be dependent on the life of the *beneficiary*—" during the life of *such person*, or for a shorter term." (Rev. Stats., p. 728.) This construction was given in view of, and the judgment of the Court influenced by, other sections of the statute, through which the charitable intent of the testator could be effectuated. The sections were 45, 47, 49, and 58. (Rev. Stats. N. Y. 727, 728.) They prescribed that every estate in lands should be deemed a legal estate, " except when otherwise provided in this chapter." (§ 45. And see § 55.) That every person thereafter entitled in equity to possession and receipt of rents of lands should be deemed to have a legal estate therein, equal, in quality and character, to his beneficial interest. (§§ 47, 48.) That, in case of a disposition of lands, " whether by deed or devise," to one or more persons, for the use of, or in trust for, another, no estate should

vest in such person or persons; and that every such disposition *must be made* directly to the person in whom the right to possession and profits is intended to be vested. (§ 49.) That, where an express trust should be created for any purpose not enumerated in section 55, no estate should vest in the trustees; "but the trust, if directing or authorizing the performance of any act which may be lawfully performed under a power, shall be valid as a power in trust, subject to the provisions in relation to such powers contained in article third of this title." (§ 58.) Article third, thus referred to, classified powers, general and special. (Rev. Stats. 731.)

The sections and article above referred to were originally transferred in substance to, and incorporated in, our Civil Code. They were carefully eliminated from our law by the amendments which took effect July 1st, 1874.

In *Downing* v. *Marshall*, 23 N. Y. 379, the Court of Appeals of New York said that, by the revision of 1830 (Revised Statutes) the law underwent considerable change. But added: "There has been some misapprehension as to the character and extent of the change. All express trusts were abolished, except certain ones enumerated in the 55th section of the statute. * * * The system of trusts was a complicated one, and was believed to be attended with great inconveniences. These it was proposed to remedy, not by depriving men of the power of disposing of their estates, nor even by *abridging* that power, but by giving effect to such dispositions according to a more simple classification, so as to relieve this branch of the law from much useless refinement and perplexity." As to trust estates purely passive, the provisions of the statute vested the title in the beneficiary. Active, express trusts were defined in section 55. "All other express trusts were abolished; by which the revisers and Legislature intended simply that legal estates impressed with trust duties should be created only in the cases specified. The provisions of the statute were aimed against the attempt to create such estates or titles, *but not against the duty, trust, or power.* This is perfectly manifest from the provision which declares that if an express trust be created, for any purpose not enumerated * · * * and the trust authorizes the performance of any act lawful under a power, it shall

be valid as a power in trust.  (§ 58.)   There was very wisely *no attempt to enumerate or define the acts* which might be lawfully done under a power, and in this respect, therefore, the law was subjected to no innovation." (*Downing* v. *Marshall*, 23 N. Y. 379.)

With reference to this case, further, it may be observed that the Court did not find it necessary to consider or discuss the subject of perpetual charities.   The testator had not attempted to establish such a charity.   By his will he directed his executors to continue in operation certain manufacturing establishments *during the natural lives of two persons named*, and to distribute the net annual profits thereof—one half in equal shares to the American Bible Society, the American Tract Society, and the American Home Missionary Society, and the other half in supporting the Marshall Infirmary.

Of these the Bible Society, the Tract Society, and the Marshall Infirmary were incorporated associations.   By a provision of the law under which the Bible Society and the Tract Society were incorporated, it was declared—"no devise to a corporation shall be valid unless such corporation shall be expressly authorized by its charter or by statute, to take by devise."   The Bible and Tract societies were not expressly authorized, either by their charters, or by any statute, to take by devise.   The Court held—Denio, J., dissenting—that this fact was conclusive as to them—equally conclusive whether the devises were attempted perpetuities or not; or whether they claimed to take a benefit under the will as by a technical trust, or through the power in trust conferred on the executors.   As to the Home Missionary Society, it was unincorporated, and " composed of a fluctuating and unascertained class of persons, having no legal capacity to take the gift." (Page 382.)   There were, as the Court thought, no trustees and no ascertained beneficiaries, either as individuals, or as a class.   Where perpetual charities are upheld, still there is no power in the American courts—the Judges of which employ judicial powers alone—in a case where the gift is vague and indefinite, and no trustee is appointed and the court is given no authority to appoint by the will.   (Perry on Trusts, 731.)   The Marshall Infirmary was authorized to take by its charter.

It was said by Porter, J., in *Bascom* v. *Albertson*, 34 N. Y. 619, that the decision in *Williams* v. *Williams*, 8 N. Y. 525, to the effect, "the provisions of the Revised Statutes respecting trusts, perpetuities, and the limitations of future estates were not designed to, and do not at all affect conveyances or testamentary gifts to religious or charitable corporations," was reversed in *Beekman* v. *Bousor*, 23 N. Y. 315–318. But what is said in *Beekman* v. *Bousor*, with respect to the controlling influence or the statutes on "Trusts," relates to a clause in the will there under consideration which seems to have been treated by the Court as an attempt to suspend, by means of a private trust, the power of alienation for a period not dependent on lives in being. That such was the understanding of the Court is rendered more apparent by an examination of the cases referred to in support of the proposition there laid down. They are: *Hawley* v. *James*, 16 Wend. 61, and *Boynton* v. *Hoyt*, 1 Denio, 53. In *Hawley* v. *James* it was held that the creation of a trust term by will to continue until the youngest of the testator's children and grandchildren, attaining the age of twenty-one years, shall attain that age, when the number exceeded *two*, was void under the Revised Statutes of New York. In *Boynton* v. *Hoyt* it was held that where the testator devised his estate to trustees to receive and apply the rents and profits in accordance with the third subdivision of section 55, but which trust was to continue until the testator's youngest child would, if living, attain the age of twenty years, the devise was void for suspending the power of alienation for a period not limited by the continuance of *two lives* in being at the creation of the estate.

A gift to individuals or persons in their private capacity will not be charitable. (*Thornber* v. *Wilson*, 3 Drew, 245; S. C., 4 id. 350–357; *Doe* v. *Aldridge*, 4 T. R. 264; *Doe* v. *Copestake*, 6 East, 328; *Morice* v. *Bishop of Durham*, 9 Ves. 399; S. C., 10 id. 522.) In order that there may be a good trust for a charitable use, there must be some public benefit open to an indefinite and vague number; the persons to be benefited must be uncertain and indefinite, until they are selected or appointed to be the particular beneficiaries of the trust for the time being. (Perry on Trusts, 710, and cases

cited.)   It is no charity to give to a friend.   *   *   The thing given becomes a charity when the uncertainty of the recipient begins.

Nor can we agree that the reasoning in *Williams* v. *Williams,* 8 N. Y. 525, is materially weakened by what was decided in *President etc. of the College of St. Mary Magdalen, Oxford,* v. *The Attorney-General,* 6 H. of L. C. 206–208. There it was determined simply that a statute of limitations, applicable to all trusts, was applicable to certain charities. *Williams* v. *Williams, supra,* did not turn upon the broad proposition that charities were unaffected by *every* general statute as to trusts.

What is said as to the applicability of the statutes respecting perpetuities and trusts to charities in *Levy* v. *Levy,* 33 N. Y. 97, expresses the opinion of but three of the eight Judges of the Court of Appeals.   Denio, C. J., and Campbell, J., dissented from the conclusion to which the Court arrived. Judges Davies, Brown, and Potter concurred only in holding that the trust failed under the laws of Virginia, for the reason that the whole scheme was founded upon the assumed validity of the devise therein of a certain farm in Virginia—such devise being void as against the laws of that State.   Judge Potter expressly dissented from that portion of the opinion which held the trust void under the laws of New York.

VII.  Law of Virginia.

It may be well, at this point, to examine the law of the State of Virginia with respect to trusts for charitable uses. The leading case is, *Gallego's Executors* v. *Attorney-General,* 3 Leigh, 487; S. C., 24 Am. Dec. 650.   It is there said by Mr. Justice Carr: " In England, charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, can not be established by a Court of Equity, *either exercising its ordinary jurisdiction, or enforcing the prerogative of the King,* independent of the statute 43 Elizabeth ; and as that statute, if ever in force here, was repealed in 1792, I conclude that charitable bequests stand on the same footing with us as all others, and will alike be sustained or rejected by Courts of Equity."

*Janey's Executor* v. *Latane,* 4 Leigh, 327, seems to have

been decided on authority of *Gallego's Executors* v. *Attorney-General.* In *Brooke* v. *Shacklett,* 13 Gratt. 301, the proposition was repeated, that as the statute 43 Elizabeth constituted no part of the law of Virginia, charitable bequests were to be treated as standing on the same footing with other bequests. *Seaburn* v. *Seaburn,* 15 Gratt. 423, recognized as law *Gallego's Executors* v. *Attorney-General,* except as modified by subsequent statutes.

It will be seen that the Viriginia cases turned in no degree upon statutes of that State prohibiting alienations or defining trusts, but upon the broader principle that, independent of the statute of Elizabeth, Courts of Equity cannot establish charitable trusts when no legal estate vests, and the trust is so vague that its benefits cannot be claimed by *cestuis que trustent.* It is not for us to decide whether the principle was always properly applied.

VIII. Jurisdiction of Court of Chancery in England independent of statute of Elizabeth.

We are thus conducted to the consideration of the questions: Did the Court of Chancery in England, as part of its ordinary jurisdiction, have power to establish and administer charities, prior to the statute of Elizabeth? If so, what was the nature, and what were the limits of that jurisdiction?

The solution of these questions is perhaps peculiarly important here, since the statute 43 Elizabeth has never been adopted in this State.

The leading case in Virginia relies entirely on *Baptist Association* v. *Hart,* 4 Wheat. 1.

VIII a. Of Cases in the Supreme Court of the United States.

*Baptist Association* v. *Hart* arose out of a bequest in the will of Silas Hart, a resident of Virginia, which was as follows: "Item, what shall remain of my military certificates at the time of my decease, both principal and interest, I give and bequeath to the Baptist Association that for ordinary meets at Philadelphia annually, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family."

Previous to the death of the testator, the Legislature of Virginia had repealed all English statutes, including 43 Elizabeth.

The "Baptist Association" had existed as an organized body for many years before the date of the will. After the death of the testator, it had received a charter from the Legislature of Pennsylvania, incorporating it by the name "The Trustees of the Philadelphia Baptist Association."

It was held in effect that no personal benefit was intended to the individuals composing the Association. They were continually fluctuating, and were not designated in the will. The intent was to constitute the Association, in its collective capacity, trustee. Held, further, that the Association could not take, because not incorporated at the decease of testator. "At the death of the testator there were no persons in existence capable of taking this bequest." Those for whose ultimate benefit the legacy was intended were to be designated and selected by the trustees. It followed, in the opinion of the Court, that as the Baptist Association was incapable of executing the trust, or even of taking it on themselves, the selection could never be made, nor the persons designated who might take beneficially.

Nevertheless, the question remained whether the character of the legacy, as a charity, would entitle it to the protection of the Court.

"That such a legacy would be sustained in England is admitted," said Mr. Chief Justice Marshall.

It was contended, on behalf of the executors, that such a legacy would be sustained in England only in virtue of the royal prerogative, or of the statute 43 Elizabeth, and not in virtue of the rules by which a Court of Equity, exercising its ordinary powers, is governed; on the part of plaintiff, that the peculiar law of charities did not originate in, but existed before the statute of Elizabeth. The Court seems to have adopted the view of counsel for the executors, and proceeds to decide not only that charitable bequests, "where no legal interest is vested, and which are too vague to be claimed by those for whom the benefit is intended," can not be established by a Court of Equity in the exercise of its ordinary jurisdiction, independent of the Elizabethan statute, but also—appar-

ently, but, perhaps, only apparently—that they could not have been established by the English chancellor, even in the enforcement of the prerogative of the crown, independent of that statute.

It is not necessary to consider whether the last proposition was involved in the determination of *Baptist Association* v. *Hart.* There has never been any legislative attempt to devolve upon the courts of California the sovereign power which was employed by the king, as *parens patriæ*, in the superintendence or administration of charities; even if, under ,our Constitution, powers not judicial can be conferred upon the courts.

The opinion of the Chief Justice in *Baptist Association* v. *Hart,* seems to have been concurred in by all the Associate Justices except Mr. Justice Todd, who was absent.

In *Vidal* v. *Girard's Executors,* 2 How. 127, however, Mr. Justice Story, in an opinion unanimously concurred in by the members of the Supreme Court of the United States—after pointing out that the case differed in two particulars from *Baptist Association* v. *Hart,* inasmuch as, in the latter, there was both a *donation to trustees incapable of taking and beneficiaries uncertain and indefinite*—proceeded to say: " There are, however, dicta of eminent Judges (some of which were commented upon in the case in 4 Wheat. 1), which do certainly support the doctrine that charitable uses might be enforced in chancery upon the general jurisdiction of the Court, independently of the statute of 43 Elizabeth; and that the jurisdiction had been acted upon not only subsequent but antecedent to that statute.  Such was the opinion of Sir Joseph Jekyll in *Eyre* v. *Countess of Shaftsbury,* 2 P. Wms. 102; S. C., 2 Eq. Abr. 710, pl. 2, and that of Lord Northington in *Attorney-General* v. *Tancred,* 1 Eden, 10; S. C., Amb. 351; 1 Wm. Bl. 90; and that of Lord Chief Justice Wilmot in his elaborate judgment in *Attorney-General* v. *Lady Downing,* Wilmot's Notes, 1, 26, given after an examination of all the leading authorities.  Lord Eldon in the *Attorney-General* v. *The Skinner's Company,* 2 Russ. 407, intimates in clear terms his doubts whether the jurisdiction of Chancery over charities arose solely under the statute of Elizabeth; suggesting that the statute has perhaps been construed with reference to a

supposed antecedent jurisdiction of the Court, by which void devises to charitable purposes were sustained. Sir John Leach, in the case of a charitable use before the statute of Elizabeth (*Attorney-General* v. *The Master of Brentwood School*, 1 My. & K. 376), said: 'Although at this time no legal devise could be made to a corporation for a charitable use, yet lands so devised were in equity bound by a trust for the charity, which a Court of Equity would then execute.' In point of fact the charity was so decreed in that very case, in the twelfth year of Elizabeth. But what is still more important is the declaration of Lord Redesdale, a great Judge in Equity, in the *Attorney-General* v. *The Mayor of Dublin*, 1 Bligh's N. R. 312, 347 (1827), where he says: 'We are referred to the statute of Elizabeth, with respect to charitable uses, as creating a new law upon the subject of charitable uses. That statute only created a new jurisdiction; it created no new law. It created a new and ancillary jurisdiction, a jurisdiction created by commission, etc.; but the proceedings of that commission were made subject to appeal to the Lord Chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the Court of Chancery as it existed before the passing of that statute; and there can be no doubt that by information by the Attorney-General the same thing might be done.' He then adds, 'the right which the Attorney-General has to file an information, is a right of prerogative. The king, as *parens patriæ*, has a right by his proper officers, to call upon the several Courts of Justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases.' So that Lord Redesdale maintains the jurisdiction in the broadest terms, as founded in the inherent jurisdiction of Chancery independently of the statute of 43 Elizabeth. In addition to these dicta and doctrines, there is a very recent case of *The Incorporated Society* v. *Richards*, 1 Dr. & War. 258, where Lord Chancellor Sugden, in a very masterly judgment, upon a full survey of all the authorities, and where the point was directly before him, held the same doctrine as Lord Redesdale, and expressly decided that there is an inherent jurisdiction in Equity in cases of charity, and

that charity is one of those objects for which a Court of Equity has at all times interfered to make good that which at law was an illegal or informal gift; and that cases of charity in Courts of Equity in England were valid independent of and previous to the statute of Elizabeth.

"Mr. Justice Baldwin, in the *Case of the Will of Sarah Zane* (*Magill* v. *Brown*, Brightly's R. 346), which was cited at the bar and pronounced at the April term of the Circuit Court, in 1833, after very extensive and learned researches into the ancient English authorities and statutes, arrived at the same conclusion in which the District Judge, the late lamented Judge Hopkinson, concurred; and that opinion has a more pointed bearing upon the present case, since it included a full review of the Pennsylvania laws and doctrines on the subject of charities.

"But very strong additional light has been thrown upon this subject by the recent publications of the Commissioners on the Public Records in England, which contain a very curious and interesting collection of the Chancery records in the reign of Queen Elizabeth and in the earlier reigns. Among these are found many cases in which the Court of Chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish in the most satisfactory and conclusive manner that cases of charities, where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to take. These records, therefore, do, in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale, and Lord Chancellor Sugden. Whatever doubts, therefore, might properly be entertained upon the subject when the case of the *Trustees of the Philadelphia Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, was before this

Court (1819), those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded." (*Vidal* v. *Girard*, 2 How. U. S. 194–196.)

That *Vidal* v. *Girard's Executors* was believed by Mr. Justice Daniel to have derived the judicial power of Courts of Equity with respect to charities from the common law, independent of the statute of Elizabeth, is sufficiently manifest from his remarks when concurring in the judgment in *Fontaine* v. *Ravenel*, 17 How. 369.

In that case it was held—the testator having willed that his executors and trustees "should dispose of the residue of his property for the use of such charitable institutions in Pennsylvania and South Carolina as *they or he may deem most beneficial* to mankind," and no appointment of the charity having been made during the life-time of the trustees—that the charity could not be carried out by the employment of ordinary equitable powers.

In concurring in the judgment Chief Justice Taney and Mr. Justice Daniel differed. The former argued that whatever jurisdiction was exercised in cases of charities prior to the statute of Elizabeth, was exercised in virtue of the prerogative power and not as a part of the jurisdiction of Chancery as a Court of Equity. The latter, while freely admitting that the United States Courts are vested with no prerogative power, was equally confident that the Court of Chancery in England, apart from the prerogative and from the statute of Elizabeth, could take jurisdiction of charities where the charitable objects were not defined with perfect precision.

The case itself may safely be brought within the established principle, that, if an estate is given to trustees to be applied to such charitable purposes as they in their discretion shall judge best, and the trustees die without naming the beneficiaries, the Court will be governed by the apparent intent of the donor in determining whether it can appoint new trustees. If it is determined that a peculiar personal trust and confidence were intended new trustees will not be appointed. (*Loring* v. *Marsh*, 2 Cliff. 469; S. C., 6 Wall. 337; *Marsh* v. *Renton*, 99 Mass. 132.) In such cases the appointment of new trustees is refused when it appears from the will

that the testator intended that none but the persons by him named should be intrusted with the power.

In *Ould* v. *Washington Hospital*, 95 U. S. 309, the Supreme Court of the United States say, that the statute of Elizabeth neither increased nor diminished the pre-existing Equity jurisdiction.

VIII. b. Of cases in the Courts of the several States.

It is said by Mr. Perry: "Courts of Equity in the various States where they are not prohibited by statutes, exercise an original, inherent jurisdiction in Equity over charities, applying to them the rules of Equity, together with such other rules applicable to charities, as Courts of Equity may exercise under the constitutions and laws of the several States; and the Courts do this by virtue of their inherent powers, without reference to the question whether the statute has been technically adopted in their States." (Perry on Trusts, 694.)

In *Jackson* v. *Phillips*, 14 Allen, 574, Gray, J., clearly points out the distinction between the two sorts of powers, to describe which the term *cy pres* has been used in the books; the one kind being employed under the sign manual of the crown, the other under the general jurisdiction in Equity. The cases in which the disposition of a charity is held to be in the crown by sign manual, are of two classes: the first, of bequests to particular uses charitable in their nature, but illegal; and the second, of gifts of property to charity generally, without any trust interposed. In neither of these classes is exercised a judicial power of expounding and carrying out the testator's intention, but a prerogative power of ordaining what the testator has failed to express. As we have seen, the Courts of California can employ only judicial powers.

The learned Justice, in the case last cited, proceeds: "The jurisdiction of the Court of Chancery to superintend the administration and decree the performance of gifts to trustees for charitable uses, of a kind stated in the gift, stands upon different grounds; and is part of its Equity jurisdiction over trusts, which is shown by abundant evidence to have existed before the passage of the statute of charitable uses." He fortifies his position by an imposing array of English and American cases. He adds, "that it is well settled, that, when a gift is made to trustees for a charitable purpose, the general

nature of which is clearly pointed out, and which is lawful and valid at the time of the death of the testator, and no intention is expressed to limit it to a particular institution or mode of application, and afterwards, either by change of circumstances, the scheme of the testator becomes impracticable, or by change of law becomes illegal, the fund having once vested in charity, does not go the heirs at law as a resulting trust, but is applied by the Court of Chancery, *in the exercise of its jurisdiction in Equity,* as near the testator's particular directions as possible, to carry out his general charitable intent." (P. 580.)

We are not called upon to exercise the power *cy pres,* even as a judicial power. But surely the assertion of jurisdiction to employ the power, judicially, includes to the full an assertion of jurisdiction to recognize and declare valid, devises and bequests of the character mentioned.

The opinion in *Jackson* v. *Phillips* is further valuable as containing a succinct and exhaustive definition of *charities* as the word is to be employed in American Courts of Equity. "A charity is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds and hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, by erecting or maintaining public buildings or works, or otherwise lessening the burdens of governments."

In *Paschal* v. *Acklin,* 27 Texas, 173, a trust to charitable uses—the beneficiaries being designated in general and collective terms—was broadly upheld and maintained. In Missouri it was held that the jurisdiction of Courts of Equity over charitable uses and devises was not grounded upon the statute of Elizabeth, but upon the common law. (*Chambers* v. *St. Louis,* 20 Mo. 543.)

In Ohio, a residuary clause in a will: "The remainder of my estate I do hereby give to the poor and needy, and fatherless," etc., of two townships named, "to such poor as are not able to support themselves, to be divided as my executors may deem proper, without any partiality," etc.: Held, that

the Court of Equity, upon general principles, independently of the statute of charitable uses (43 Elizabeth), had power to enforce the trust. (*Landis* v. *Wooden*, 1 Ohio St. 160.)

In Maine it was said by the Supreme Court: "The better opinion of the most eminent jurists in England and this country, is, that a donation to charitable uses could be carried into effect in Chancery, without the aid of the statute of Elizabeth." (*Preachers' Aid Society* v. *Rich*, 45 Me. 559; and see there cited, *Burbank* v. *Whitney*, 24 Pick. 146.)

In Illinois it would seem to have been held that the intention of the donor of a charity will control, where trustees have been named, unless it is impracticable precisely to carry out such intention, and in the latter case that the doctrine of *cy pres* will be applied; and this without deciding that the statute of Elizabeth was part of the law of that State. (*Gilman* v. *Hamilton*, 16 Ill. 225.) In *McCord* v. *Ochiltree*, 8 Blackf. 15, it is said that the *principles* of the statute of Elizabeth would be applied in Indiana. After saying, further, that if it had been the opinion of the Supreme Court of the United States when *Baptist Association* v. *Hart* was decided —as it was subsequently declared to be its opinion in *Vidal* v. *Girard's Executors*—that Chancery in England had an inherent jurisdiction over charities independent of the statute of Elizabeth, there could be no doubt that the legacy of Hart's will would have been sustained as a charity—added: "Our opinion is that the legacy under consideration, though void at law for the want of trustees capable, at the time of the death of the testator, of taking or executing the trust, and on account of the vague indication of the objects of the charity, is valid as a charity, both in reference to the statute of Elizabeth, and to the law of charities in a Court of Equity as it stood before the passage of that act." It was decided by the Supreme Court of Georgia that the American Colonization Society was not competent to execute a certain trust for the benefit of enfranchised slaves; but as the latter were capable of taking, the Chancellor would appoint other persons to carry the trust into effect. The statute of Elizabeth was not referred to as conferring jurisdiction. (*Walker* v. *Walker*, 25 Ga. 420.) *Williams* v. *Pearson*, 38 Ala. 299, determines, that, in Alabama, the doctrine is settled, that the Chancery

Court has jurisdiction, by virtue of its original, common law powers, without claiming prerogative powers, and without the aid of the statute of 43 Elizabeth, to uphold bequests to charitable uses, where an ascertainable object, recognized as charity, is designated by the testator in general or collective terms, although no trustee is appointed by him, or the trustee appointed is incapable of taking the legal interest.

Chancellor Kent doubted whether the English system of charities was to be referred exclusively to the statute of Elizabeth, and was of opinion that the weight of the English decisions was in favor of an original and necessary jurisdiction in Chancery. (2 Kent's Com. 3d ed. 2877.)

The citations showing an enlarged jurisdiction in Courts of Equity in this country, which does not depend upon the English statute, might be multiplied. (See *inter alia, Zanesville C. & M. Co.* v. *Zanesville,* 17 Ohio St. 352; *Johnson* v. *Mayor; Miller* v. *Chittenden; Ex'rs Burr* v. *Smith,* 7 Vt. 241; S. C., 29 Am. Dec. 154.)

VIII c. Of New York cases.

The case of *Williams* v. *Williams,* 8 N. Y. 526, has been so severely criticised that it may be well to inquire, with some particularity, what was decided by it, and how far the propositions there laid down are sustained by rulings elsewhere, to which reference has already been had.

One of the legacies there considered was to a religious corporation, which, by the statute in force when it was organized, and prior to the enactment of the Revised Statutes, was authorized to purchase and hold real and personal estate to a limited amount; an amount which was not exceeded by the bequest. It was contended that this legacy was illegal, as creating a perpetuity contrary to the provision of the Revised Statutes, which prohibited the suspension of the absolute ownership of personal property for a longer period than two lives in being. (1 Rev. Stat. 773, § 1.) The Court proceeds to show that by fair construction of the act concerning religious corporations, corporations under it were, before the Revised Statutes, authorized to hold real and personal property in perpetuity; and, this much established, finds that the authority was not taken away by the Revised Code. The Court said: "It has been laid down that the law will not allow

the exposition of a statute to revoke and alter, by construction of general words, any particular statute where the words may have their proper operation without it. Dwarris on Stat., ed. 1846, p. 532, and cases cited. * * * The rule deduced by Mr. Dwarris, from an examination of the authorities, is, that 'where the intention of the Legislature is not apparent to that purpose, the general words of another and later statute shall not repeal the particular provisions of the former one.' (Dwarris on Stat., p. 514.)" Other reasons are urged why the section of the Revised Statutes was not applicable to the vesting of estates for charitable uses in corporations previously authorized to take to the particular use by the law of their charter. The other gift, considered in *Williams* v. *Williams*, was to Zophan B. Oakley and others, trustees, and their successors, of six thousand dollars, to be loaned, etc., and the interest to be perpetually expended in supporting an academy for the instruction of the children of the poor, etc.

A line of succession through the fluctuating and uncertain class, "the children of the poor," not being known to the ordinary rules of law, could not, says the Court, be made the channel for the perpetual transmission of the beneficial ownership of property, unless by force of that peculiar system of law, known in England under the name of charitable uses. It was objected to this bequest that in its nature it called for, and the provisions of the will assumed to create, a perpetuity. It was admitted that if the Revised Statutes applied to gifts for charitable purposes, the objection was fatal to the bequest. But according to English law, conveyances, devises, and bequests for the support of charity or religion, though defective for want of such grantees or donees, as the rules of law require in other cases, would (when not within the purview of the mortmain act) be supported and established in the Court of Chancery. (*Case of Christ Church, Cambridge,* 1 Wm. Bl. 90; *Moggredge* v. *Thackwell,* 7 Ves. 36.) The learned Judge (Denio, J.) adds: "Having adopted the common law of England, so far as it was applicable to our circumstances, and conformable to our institutions, the law of charitable uses is in force here, unless, first, it was established by an English statute which has been abrogated; or, secondly, unless there is something in the system repugnant

to our form of government; or, thirdly, unless it can be shown by the history of our colonial jurisprudence that it was not in force here prior to the Revolution; or, lastly, unless it has been abolished by the Revised Statutes."

The opinion then proceeds to set forth an abstract of the statute 43 Elizabeth, c. 4. To the point that the peculiar law of charities was known and recognized, before the statute, are cited *McCartee* v. *Orphan Asylum,* 9 Cow. 437; S. C., 18 Am. Dec. 576; *Ex'rs of Burr* v. *Smith,* 7 Vt. 241; S. C., 29 Am. Dec. 154; *Vidal* v. *Girard's Ex'rs,* 2 How. 127, and Story's Comm. on Eq., § 1136 *et seq.* It is said: "The statute of charitable uses was not introductory of any new principles." And, in another place: "The whole object of the statute seems to have been to provide a remedy against the abuses of charities. That form has been long since abandoned, and relief in that class of cases is now sought under the ordinary forms of justice in use in the Court of Chancery. The present English doctrine of charities does not, therefore, depend upon the statute, so far as the course of proceeding is concerned; for nothing could well be more dissimilar than the two modes. It can not be said that the existence of charitable gifts originated in the statute, for the *preamble* shows that the object in passing it was to reach gifts already in existence; to redress breaches of trust which had been committed by trustees under donations theretofore made." And, again (quoting from Shelford, 278): "The general proceeding, in the case of charities, has been for many years past by the *old mode of information,*" etc.

The statute of Elizabeth, together with the statute 9 Geo. II., c. 36, had, at an early day, been repealed by the Legislature of New York. But the Court finds sufficient reasons for the repeal of the statute of Elizabeth in the circumstance that our political system knows of no dioceses, nor of bishops, to whom or to whose chancellors commissions could issue; and concludes that from the repeal no inference can be drawn hostile to an equitable jurisdiction independent of the statute. "The most which can be said is, that we repealed an obsolete statute providing one mode of enforcing them (charities), which was inapplicable to the situation of the country." (P. 546.) From the repeal of the statute of *mortmain* the court

infers simply an intention to give the greatest scope to the founding and endowing of institutions and trusts for promoting education and religion.

It is impossible to withhold our admiration for the clearness of mental vision and precision of language which the opinion in *Williams* v. *Williams* displays.

The learned Court admits that the doctrine of *cy pres,* so far as it was based upon the intervention of the King, has no place in the New York law. "The reason is that we have no magistrate clothed with the prerogatives of the crown, and our Courts of Justice are intrusted only with judicial authority."

The views of the Court in *Williams* v. *Williams,* as to the derivation of the powers of Courts of Equity, are supported by Chancellor Kent in *Coggeshall* v. *Pelton,* 7 Johns. Ch. 292; S. C., 11 Am. Dec. 471, and by other earlier decisions in New York.

It had also been held that a bequest to a corporation not authorized to take by devise, and excepted from the statute of wills, was invalid. Here was a statutory inhibition. (*McCartee* v. *Orphan Asylum,* 9 Cow. 437; S. C., 18 Am. Dec. 576.)

In an able argument, too long for recital, the Court proceeds to show that the provisions of the Revised Statutes of New York against perpetuities had no application to the bequest under consideration. It is perfectly certain that the law of charitable uses in England was never understood to be subject to the law against perpetuities; but on the contrary, it formed a well-settled exception to the operation of that law. The Revised Statutes were enacted with a constant reference to the then existing law. Changes were not made for the mere purpose of innovation, but with a steady eye to the maxim which enjoins a strict attention to "the old law, the mischief and the remedy." The old law was well defined: Any number of *lives* might be selected to which the evidence would apply, and the estate might be rendered inalienable until the last survivor should die, and for more than twenty-one years afterwards. "What the Legislature undertook to do was simply to shorten the period of suspension. * * * To limit charitable trusts, which in their nature involve the

idea of indefinite continuity, by two lives in being, is substantially to abrogate them;" and this, remarks Denio, J., "I am sure would have been done by express and unequivocal language, had it been intended to do it at all." (P. 557.)

It has been averred that the case of *Williams* v. *Williams* has been completely overturned by the subsequent decision in *Bascom* v. *Albertson*, 34 N. Y. 584. Even if this be the case within the limits of the State where that decision was rendered, the circumstance can not be considered here as weakening the argument which supported the previous judgment. But in *Bascom* v. *Albertson* much stress is laid upon the alleged fact that, at the period when the statute of Elizabeth was repealed in New York, it was universally *supposed* that the jurisdiction in England depended upon the statute; therefore, when the Assembly repealed the statute in 1788, it must have intended to repeal the whole system of charitable uses.

What is said in *Bascom* v. *Albertson* with reference to the fact, that, since the repeal of the statute, a system has grown up in New York under which donations to charitable uses may be made to corporations; and the inference, from thence, of a legislative construction that the English system of charities came to an end upon the repeal of the statute—is hardly satisfactory. The only inference that would seem fairly deducible from statutory enactments, authorizing religious or other corporations, to take by devise or bequest, to a limited amount, for religious or charitable uses, is that, in the opinion of New York legislators, the danger is not to be apprehended in this country which the English rule and statutes of *mortmain* were intended to guard against. The point was not overlooked by Mr. Justice Denio in *Williams* v. *Williams*. He there said: "There are so many reasons why it might be desirable to enable donors to place their donations on a different footing from that on which they would stand under what I supposed to be the existing law of charitable uses, that I do not think any inference unfavorable to the existence of that law can fairly be drawn." "The creation of corporations for religious and charitable purposes, which abound in the statute-books, provide to a certain extent for the same object as charitable uses; but it would be a violent inference to say that they disprove the existence of any other method of hold-

ing or administering charitable funds." (*Williams* v. *Williams*, 8 N. Y. 557.)

In view of many early cases in New York, deciding that the courts had full jurisdiction over charitable bequests, and of the law as recognized in other States with reference to the subject, Mr. Perry—in a spirit of moderation and decorum—criticises the ruling in *Bascom* v. *Albertson*, saying: "Does the new system carry out the intention of charitable donors with more efficiency than did the old and tried system, which had grown up with time, and had been modified by the wisdom of so many judges, and still satisfies the wants of so many States?" And, with reference to the condition of the law in New York, says: "The cases thus far decided evince great learning, research, and ability; but there seems to be a want of confidence in the stability of the system, and a want of agreement both among lawyers and judges; so that the whole matter is yet in a transition state. If certainty is an element of security and safety in the law, the attempt to substitute one system for another has as yet only reached the point of rendering both systems uncertain." (Note to c. 23, Perry on Trusts.)

VIII. d. Conclusion herein.

Our conclusion upon this branch of the case, is, that Courts of Equity in this State have jurisdiction, derived from the English common law, independent of the statute of Elizabeth, to establish and enforce charities, when trustees competent to take the legal estate are named, and the class to be benefited, and the individuals to be designated by the trustees, are capable of ascertainment. Further than this it is not necessary to go in the present case.

IX. Even if the Court of Chancery in England were limited to the enforcement, as charities, of trusts for such purposes as are enumerated in the statute of Elizabeth, the Courts of Equity in California would possess as ample judicial power with respect to such charities as the English Chancery except where restricted by the Constitution.

Even if we were driven to the statute of Elizabeth as the source from which the English Court of Chancery originally derived its jurisdiction in cases of charities, it would be worthy of consideration whether the Superior Courts, and former

District Courts, did not possess the jurisdiction. If so, it would follow as a necessary consequence, that it was within the province of the Probate Court, incidentally to its general jurisdiction, to settle the estates of deceased persons, to recognize, as entitled to a distributive share of an estate, the trustees named in such valid devises and bequests. The statute of Elizabeth has neither been adopted nor in terms repealed by the Legislature of this State. The system of procedure provided in it is totally inapplicable to our social or political condition. But the English Court of Chancery has long abandoned the machinery of that statute. Its definitions and principles are indeed very frequently resorted to, and it might be admitted, for our present purpose, that nothing can judicially be declared to be a charity in England which is not enumerated in the statute, or which does not come within the " analogies" of the statute. (*Morice* v. *Bishop of Durham*, 9 Ves. Jr. 399.) The Equity jurisdiction, such as it was, and as distinguished from the prerogative power, had been established many years before the adoption of the first Constitution of California. The jurisdiction, as to the remedy, had been established independent of, and, in a certain sense, without reference to the statute ; since the modes of the statute had not only not been adhered to, but had fallen into absolute desuetude. The former Constitution of this State declared that the jurisdiction of the District Courts should extend " to all cases in Equity." (Const. 1849, art. vi, § 6.) The same jurisdiction is conferred upon the Superior Courts by the present Constitution. (Art. vi, § 5.) It might be said, then, that the jurisdiction of our Courts in Equity is to be tested by reference to the jurisdiction actually exercised by the Court of Chancery in England when our Constitution was adopted, except so far as the employment of such jurisdiction may conflict with provisions of the present Constitution, or with the Constitution of the United States ; or is inapplicable—the genius of our institutions being considered. The saying of this much would not be an attempt to re-enact the statute of Elizabeth. That statute authorized the Chancellor, etc., to issue commissions to the bishops, etc., to inquire with respect to the gifts recited in the act, to wit : " Relief of *aged* and *impotent,* and *poor people;* maintenance of sick and maimed

soldiers and mariners; *schools of learning; free schools;* scholars in universities; houses of correction; repair of bridges, ports, havens, causeways, churches, sea-banks, and highways; education and preferment of orphans; marriages of poor maids; supportation and help of tradesmen, handicraftsmen, and persons decayed; relief or redemption of prisoners or captives; and aid or ease of any poor inhabitants concerning payment of fifteens, setting out of soldiers and other taxes"—and to ascertain whether the lands and effects appropriated to these purposes had been duly employed. The Commissioners were authorized to inquire as to abuses, breaches of trust, misemployments and misgovernments of any lands, etc., goods, etc., theretofore given, limited, appointed, etc. (or which thereafter might be), "for any of the charitable and godly uses before rehearsed," and after trial and examination to "set down such orders, judgments, and decrees as the said lands, etc., might be duly and faithfully employed to and for such the charitable and godly uses and intents before rehearsed," etc. Sections 8 and 9 enact, that the "orders, judgments, and decrees" shall be certified under seal into the Court of Chancery within the time limited in the commission, and that the Lord Chancellor, or Lord Keeper, shall take such order for the due execution of all of such judgments, decrees, and orders "as to him shall seem fit and convenient."

It is remarked, by Chief Justice Marshall, that the statute "seems to proceed on the idea that the trusts it is intended to enforce, ought, in conscience, independent of the statute, to be carried into execution." (*Baptist Association* v. *Hart,* 4 Wheat. 1.) If, then, the charity is one which could have been visited and regulated under the statute of Elizabeth, it is one which the English Court of Chancery would enforce on information or bill—even assuming that the jurisdiction as to the subject-matter came from the statute.

The statute provides one method; the other method, universally resorted to when our State Constitution was adopted (supposing the power as to subject-matter was derived exclusively from the statute), was the invention of Chancery or at least grew out of the innate power of Chancery as a Court of Equity. It is hardly to be supposed that the framers of the State constitutions separated the mode from the power, or

that they intended to exclude from the general grant of jurisdiction in "all Equity cases" so large a class of Equity cases as those relating to the establishment and enforcement of charities. In Indiana it seems to have been held that a provision of the Constitution, which conferred upon the Courts of that State jurisdiction, "both as to matters of law and *Equity*," conferred power, in the nature of the prerogative power, over infants, legatees, charities, etc. (*McCord* v. *Ochiltree*, 8 Blackf. 19.) We are not here required to accede to so much; we are convinced that Courts of Equity in California are confined to powers in their nature judicial. But in determining what are the limits of the *judicial powers* to be exercised by our Courts of Equity, do we not naturally and properly look to such powers as were in fact exercised by the English Court of Chancery for generations before our Constitution was adopted? As is said by Mr. Perry, Courts of Equity in various of the States of the Union exercise a jurisdiction in Equity, without reference to the question whether the statute of Elizabeth " has been technically adopted in their States." The impression is certainly produced by the reading of some of the decisions, that Courts have simply resorted to the principles announced in England in this class of cases, and have assumed the jurisdiction because it was exercised in the English Court of Chancery, without regard to the sources from whence the powers of that Court were derived.

X. A trust in favor of "human beneficence and charity" may be valid in view of the context.

It is urged that a trust in favor of "human beneficence and charity" is not a "trust for charitable uses," within the legal signification of that expression.

In *Norris* v. *Thomson's Ex'rs*, 19 N. J. Eq. 317, it was held that a power of appointment given in a will, "to give or devise the same among such benevolent, religious, *or* charitable institutions as she may think proper," was void; that, as the power was to give to any of the three, and one of them was too vague, the trustee had the right to elect not to give to the other two. The Chancellor said: "It is conceded that by the English decisions, the words 'charitable and religious' are sufficiently definite;" but added: "The word *benevolent* is certainly more indefinite, and of far wider range than charitable

or religious; it would include all gifts prompted by good-will or kind feeling toward the recipient, whether an object of charity or not." The Chancellor further said: "In all the decisions on this subject, it has been held that a devise or bequest in England for *benevolent* objects, or in trust to give to such objects, is too indefinite, and therefore void, and not being within the scope of the statute of Elizabeth, is not saved by it." Here the word "charity" was evidently held to have acquired a settled, technical meaning by reference to the objects enumerated in the preamble to the statute of Elizabeth—a meaning less extended than that accorded to "benevolent."

A distinction might perhaps be made between *benevolent* and *beneficent.* Doctor Webster remarks: "Etymologically considered, benevolent implies merely *wishing* well to others, beneficent *doing* well. But by degrees the word benevolent has been widened to include not only feelings, but actions. Thus we speak of *benevolent* operations, benevolent labors for the public good, benevolent societies. In like manner *beneficent* is now applied to feelings. Thus we speak of the *beneficent* intentions of a donor. The extension of the terms enables us to mark nicer shades of meaning. Thus the phrase 'benevolent labors' turns attention to the *source* of these labors, viz., benevolent feeling, while beneficent would simply mark them as productive of good. So 'beneficent intentions' point to the feelings of the donor as bent upon some *specific good act,* while 'benevolent intentions' would only denote a general wish and design to do good." "Beneficence," therefore, indicating a specific design, when followed by and connected with "charity," might be held to be limited by the succeeding word, and to import an intention to provide for acts in their nature *charitable.*

In *Morice* v. *The Bishop of Durham,* 9 Ves. Jr. 399, it was held by Sir William Grant, Master of the Rolls, that the signification of "charity" was derived chiefly from the statute of Elizabeth, and that those purposes were to be considered charitable which the statute enumerates, "or which, by analogies, are deemed within its spirit and intendment." That "a bequest in trust for such objects of *benevolence and liberality* as the trustee in his own discretion shall most approve," can not

be supported as a "charitable legacy." He said: "It is clear, liberality and benevolence can find numberless objects not included in the statute in the largest construction of it. The use of the word 'charity' seems to have been purposely avoided in this will." On appeal, Lord Eldon sustained the view of the Master of the Rolls. In *James* v. *Allen*, 3 Meriv. 17, it was held that a bequest, in trust for "benevolent" purposes, could not be supported as a charitable legacy; the same learned Judge (Sir William Grant), deciding that the trust in *Morice* v. *Bishop of Durham* was not rendered uncertain, and therefore incapable of execution, merely by the addition of the word "liberality" to *benevolent*. Afterwards, in *Kendall* v. *Granger*, 5 Beav. 300, Lord Langdale, M. R., expressed himself not fully satisfied with all the decisions that had taken place on the subject, but held that a bequest "to be applied for the relief of domestic distress, assisting indigent but deserving individuals, *or* encouraging undertakings of general utility," was void. And so, a still more modern case has decided, that a direction to executors to apply the residue of an estate to any charitable or benevolent purposes, they might agree upon, was indefinite and inoperative. (*In re Jarmin's Estate*, L. R., 8 Ch. D. 584.)

Where a bequest is made for charitable purposes and also for purposes of an indefinite character, which are not charitable, the whole bequest will be void. If, for instance, a bequest is made for such charitable, *or other* purposes, as the trustee should think fit, the whole bequest will be void for uncertainty." (Tudor on Charitable Trusts, 223.) It was said by counsel (arguendo) "the principle of all the cases is, that the portion of the trust that might otherwise be construed as charitable, can not be sustained, because the trustees have an election to apply the fund to purposes not technically charitable." (Referring to *Vezey* v. *Jamson*, 1 Sim. & Stu. 69 ; *Williams* v. *Kershaw*, 5 Clark & F. 111 ; *Ellis* v. *Selby*, 1 Myl. & Cr. 286 ; *Kendall* v. *Granger*, 5 Beav. 300 ; *Thompson* v. *Thompson*, 1 Coll. 398.)

Thus it is settled in England, that the word "benevolent" in itself, without anything in its contextt to qualify or restrict its ordinary meaning, clearly includes not only purposes which are deemed charitable by Courts of Equity, but also acts

which have no relation to the promotion of education, or any other of the objects which are deemed charitable in a technical or legal sense. So, it seems to have been held, that where the objects mentioned are separated by the disjunctive " or," and it appears that it was the intention that the trustees might apply the whole fund to purposes not charitable, a gift must fail.

In *Williams* v. *Kershaw*, 5 Clark & F. 111, the gift was for such benevolent, religious, *and* charitable purposes as the trustees should, in their discretion, think most beneficial. The Master of the Rolls considered that these words were to be taken, not conjointly, but in a distributive sense. But in *Mitford* v. *Reynolds*, 1 Ph. 185, Lord Lyndhurst held, that even if the words " charitable, beneficial, and public," were to be taken distributively and not conjunctively, yet when the words were followed by others, indicating that the money was to be applied to *works* for the general benefit of the inhabitants of a certain place, the previous words were limited by the latter, so that taking them together, a charity was created.

As said by Gray, J., in *Chamberlain* v. *Stearns*, 111 Mass. 268, the only difference in opinion in the adjudged cases, on this subject, has been the question how far the word " benevolent," when used to describe the purposes of a trust, could be deemed to be limited in its meaning by being associated with other words more clearly pointing to a strictly charitable disposition of the fund. In the same case the learned Judge adds that it has been held by the House of · Lords that " benevolent" with " charitable" or any equivalent word, or used in such connection, or applied to such institutions or corporations, as to manifest an intent to make it synonymous with "charitable," might have effect according to that intent. True, the cases cited by him in support of this statement (*Chamberlain* v. *Stearns*, 111 Mass. 268), are Scotch cases; and the Scotch law is less strict as to charitable dispositions than the English. (Lord Cottenham in *Miller* v. *Rowan*, 5 Cl. & F. 110; Lord Lyndhurst in *Crichton* v. *Grierson*, 3 Bligh's N. R. 438.) Nevertheless, the principle is indisputable, for it arises out of a rule of interpret-

ation, universally applicable, that the intention of the author of every written instrument is to be sought in the context.

In the will before us the testator, after "devoting" the income of the California Theater property perpetually to "human beneficence and charity," adds, that while he does not wish to set "arbitrary limits" to the wisdom, faithfulness, and discretion of his trustees, yet desiring, as he does, "to foster religion, learning, and charity," he calls their attention to "the trials and afflictions of the industrious, striving, unfortunate *poor*," and to "honorable and striving young men," for whom he wishes established a scholarship, to be known as "The Hinckley Scholarship," etc.

It is admitted that "learning" is a charitable use. We shall endeavor to show that "religion," in the broad sense in which the word is employed, is charitable.

Thus the intent of the testator is made more specific, and those things are benevolent or beneficent which advance religion and learning, and aid the poor. The conjunction between "beneficence" and "charity" may, in view of his intent as explained by what follows, be properly taken as uniting synonyms. *Copulatio verborum indicat quod accipiantur in eodum sensu.* (*Saltonstall* v. *Sanders*, 11 Allen, 446.) The terms used ought not to be measured separately, but each is to be considered in its relation to the entire provision, and the general meaning of each is restricted by its associations, and made subordinate to the main purpose. (*Rotch* v. *Emerson*, 105 Mass. 431.) Applying the maxim *noscitur a sociis*, "beneficent" must be understood to refer to the charitable purposes which the testator intended to indicate in the clause as a whole.

But if the word *beneficent* is held to be the equivalent of *benevolent*, and a doubt remains whether the insertion of the latter in the will may not have destroyed the gift as a charity, it would seem that the language of section 1313 of the Civil Code must dispel the doubt. By that section *charitable* and *benevolent corporations* are placed upon the same footing; and it is to be supposed the "trusts to charitable uses," mentioned immediately afterwards, include the same purposes as those for which the corporations named may be organized.

As to the word "religion" used in connection with "learn-ing and charity," if it can be given effect without violating any principle of existing law, it is our duty to give it such effect. (*Whicker* v. *Hume*, 14 Beav. 509; S. C., 1 De G. M. & G. 506; S. C., 7 H. L. Cases, 124; *Saltonstall* v. *Sanders*, 11 Allen, 455; *Jackson* v. *Phillips*, 14 id. 557.) In its pri-mary sense (from *religare*, to rebind, to bind back), it im-ports, as applied to moral questions, only a recognition of a conscientious duty to recall and obey restraining principles of conduct. In such sense we suppose there is no atheist who will admit that he is without religion. But whatever, if any, the form of religion which the testator desired to foster, the context sufficiently indicates that it was to be fostered only by such acts of charity as of themselves are in full accord with the law of the land. Beyond this, the fact that all reli-gions are tolerated in this country—or rather, that all men are free to profess and practice any religion not violative of the legal rights of others—does not invalidate every devise or bequest for the advancement even of a particular sect. Such bequests have been often upheld; as gifts to be appro-priated to the benefit of the "Friends' Meeting;" for the as-sistance of "Respectable Unitarian Congregations;" for the "Universalist Denomination;" for the "Maintenance of a Shaker Community." (*Earle* v. *Wood*, 8 Cush. 437; *Dexter* v. *Gardner*, 7 Allen, 245; *Shrewsbury* v. *Hornby*, 5 Hare, 406; *North Adams Univer. Soc.* v. *Fitch*, 8 Gray, 421; *Gass* v. *Wilhite*, 2 Dana, 170; S. C., 26 Am. Dec. 446.)

XI. *Cy pres*, a judicial power.

It has further been contended by appellant that, at the most, the will is to be treated as dedicating the property to charity in general terms, and, so treating it, the trust can be satisfied by means of the *cy pres* power alone—a power which Courts of Equity in this State can not exercise.

We have already pointed out the distinction between the *cy pres* as a prerogative and as a judicial power. We enter-tain no doubt that in the general devolution upon the Courts of this State of all judicial power, with respect to charities, is included the power *cy pres*, so far as the same may be employed in directing trustees named in a will or deed to carry into effect the general lawful and charitable intent,

when the particular scheme is impracticable, or has become unlawful. In such, and other like cases, a resort can be had to the doctrine without departing from the strict limits of ordinary Chancery jurisdiction. "Where," said Lord Eldon, "the execution is to be by a trustee with general or some objects pointed out, then the Court will take the administration of the trust." (*Moggredge* v. *Thackwell*, 7 Ves. 86.) It was where the charities were illegal or indefinite, without trustees to determine the definite purposes, that they could only be carried into effect *cy pres*, by the sovereign power as an act of prerogative.

XII. The Probate Court was not called on to employ the power *cy pres*.

Here the *classes* to be benefited are clearly indicated. The purpose is apparent. The attention of the trustees is called to the industrious, striving, and unfortunate poor—especially the aged, the infirm, and the lonely—and to honorable, *striving* young men seeking moral and intellectual culture. Every written instrument must be read as a whole; a will is to be construed "by the four corners." Words of request, or even the expression of a preference, are binding upon a devisee or executor in cases of private trusts. (2 Story's Eq. Jur. 1068; 1 Jarman on Wills, 334.) *A fortiori* in cases of charities, because the Courts look with favor upon all attempted charitable donations, and will endeavor to carry them into effect if it can be done consistently with the rules of law. A bequest intended as a charity is not void, and there is no authority to construe it to be legally void, if it can possibly be made good. (*Sorresby* v. *Hollins*, 9 Mod. 221; *Grimmett* v. *Grimmett*, Amb. 211; 1 Coll. Jurid. 439.)

Surely the intent to aid in the support of the poor—especially the aged, infirm, and lonely—and to assist in the education of a class, permeates the language of the testator. If his purpose can be held to have been to devise property for such charitable uses as may aid and support the poor generally, and to educate some of a class of poor, he has himself nominated his trustees; he has vested in them the legal estate and they have accepted the trust. He has given them the widest discretion in selecting the particular persons to be

benefited by his bounty, with full power to reduce the general intent to a specific and practical operation. It is immaterial how uncertain, indefinite, and vague are the *cestuis que trustent*, or final beneficiaries, provided a general lawful and charitable intent is apparent, and there is a legal mode of rendering the beneficiaries certain by means of trustees. (Perry on Trusts, 732.)

XII. One third of a testator's "distributable assets" may be devised or bequeathed to charitable uses.

Another question remains to be answered: Do the words "one third of the estate" as used in section 1313 of the Civil Code, hereinbefore recited, mean one third of the gross estate of the testator, or one third of the "distributable assets"—being one third of the residue of the estate after payment of the debts, etc.? The Court below held that the statute authorized a gift to charities to the extent of one third of the appraised value of all the property.

As we have already said, the section of the code is of the same class of legislation as are *mortmain acts*—so called. The general purpose is to prevent extravagant donations, in those hours of physical and mental lassitude which often precede dissolution—"to the disherison of natural heirs." Here the niece of testator is the residuary devisee and legatee, and the purpose of the testator that she should have whatever he had not otherwise legally disposed of is sufficiently apparent. Her position is analogous to that of a sole heir where the residuum is not specially bequeathed.

The main purpose of section 1313 being to protect heirs, or those in like position, against excessive gifts to charities, it ought not to be construed so as to deprive the heirs of all benefit from the estate, unless the language unmistakably requires it. Yet that such might be the result of imposing the whole burden of the debts upon the interest of the heirs is indisputable. The word estate is indeed *nomen generalissimum*. Originally perhaps it was used to designate the *interest* which one had in land; then to indicate the land itself—technically the *corpus;* it was afterwards extended to all property real and personal. (Burr. L. D., "Estate.") In wills the import of the term depends in a great degree upon

its association with other expressions.    (Id. 2 Pow. on Dev.—
by Jarman—158, c. 10.)   The same is true, of course, when
the word is used in statutes.

As said by Mr. Abbott: "Estate is used in several very va-
riant senses.   Only the context, or the circumstances under
which it is employed, can guide one in assigning to it the
meaning intended."  (Burr. L. D., "Estate.")   The same writer
adds: "In a very common use, estate signifies the entire con-
dition in respect to property of an individual; as in speaking
of a bankrupt, decedent, or insolvent estate, or of administering
upon an estate.   Here not only property but indebtedness is
part of the idea.   The estate does not consist of the assets
only; if it did, such expressions as insolvent estates would be
misnomers."  (Burr. L. D., "Estate.")   Doubtless the "circum-
stance," already twice referred to, that the main purpose of
section 1313 is to prevent improvident dispositions to chari-
ties, to the injury of those who would otherwise receive the
donations, is to be seriously considered in determining the
specific meaning of a term which has been employed in so
many "very variant senses."   It is indeed true that the word
"estate" is used at times in the Code of Civil Procedure as
signifying all of the decedent's property.   (§§ 1645, 1648.)
Elsewhere too in the same code we find the expressions "the
residue of the estate," "the residue of any estate."  (Code
Civ. Proc. 1665, 1668.)   But too much stress ought not to be
placed upon these applications of a term, which in the codes
themselves is employed in different senses.   Thus: "The ex-
ecutor is to deliver to the heir, legatee, or devisee, the whole
portion of the estate to which he may be entitled," i. e., a por-
tion of the distributable assets.   (Code Civ. Proc. 1661.)
"Before any distribution of an estate is made," etc.   (Id.
1669.)   "When any estate is assigned." (1691.)   "The
Court must direct  *  *  *  the distribution of an estate."
(1651.)   "An order for the distribution of the estate." (1650.)
"In the decree assigning and distributing the estate." (1686.)
In the sections last cited the word estate is clearly used as the
equivalent of "distributable assets."   The generalization of
counsel for appellant would seem to be correct:   Where the
Code of Civil Procedure speaks of claims of creditors, settle-

ment of the estate, sales of property, and partnership inter-
ests, it refers to the whole estate of the decedent; but where
it speaks of the distribution of an estate, and of persons en-
titled to such distribution, and their proportionate interests,
it refers to the disposable assets only. When it speaks of an
*insolvent* estate, the word includes, in idea, the indebtedness
as well as the property.

In deciding in what sense the term is used in section 1313
of the Civil Code, therefore, the very slightest, if any, weight
should be given to the fact that it sometimes signifies the
estate in gross. The first section of the first chapter of the
title *Civil* Code (§ 1270) which treats of *wills*—the chapter
which includes section 1313—reads as follows: " Every per-
son over the age of eighteen years, of sound mind, may, by
last will, dispose of all his estate, real and personal, and such
estate not disposed of by will is succeeded to as provided in
title vii of this part, *being chargeable in both cases with the
payment of all the decedent's debts,* as provided in the Code
of Civil Procedure." True, a specific bequest is payable *first*
out of the residuum, but in such case the residuum is pre-
viously ascertained by providing for the debts. A devise or
bequest of an aliquot part of an estate would give right only
to the portion of the residuary estate. " Suppose a testator
declares in his will, ' I give one third of my estate to my son
A.,' can there be any doubt that the word estate would be
held to mean distributable assets ?"

Our conclusion is that section 1313 of the Civil Code pro-
hibits devises or bequests to charitable uses, of more than
one third of that which a testator has power to give, that is,
of the property which shall remain after payment of his debts
and charges of administration. As of what date or dates is
to be ascertained the value of the disposable property—one
third of which may go to charity?

The valuation of the "inventory" is evidently not in-
tended to be conclusive for any purpose. The appraisers
make a preliminary estimate for the information of the Court;
and as property not included in the original inventory is dis-
covered, it is made the duty of the executor or administrator
to cause the value of such property also to be estimated by
the appraisers. (Code Civ. Proc., §§ 1445, 1451.)

Yet it must be assumed that section 1313 of the Civil Code was enacted in view of the provisions of the Code of Civil Procedure which establish the mode of conducting probate cases, since such provisions and those of the Civil Code relating to wills constitute together the statutory scheme for the settlement of the estates of deceased persons. As we have seen, the testator had the right to donate to charitable uses one third of that which he had power to devise and bequeath. The whole residuum became fixed, under the Code of Civil Procedure, only when the allowed claims against the estate and costs of administration were determined, and the residuum therefore ready for distribution; that is to say, the total value of the distributable estate—the estate one third of which may be devoted to charity—is ascertainable by aggregating the values of all the assets, real and personal, distributed, as of the date or dates of distribution. If the Probate Court has not the machinery for ascertaining these values, it may still declare, in its decree of distribution, the right of the residuary devisee to an undivided interest in the theater property equal to the excess, if any such there be, beyond an interest in the trustees equal to one third of all the estate distributed. E. G.—If the value of all the property distributed was ninety thousand dollars, the trustees will be entitled to retain thirty thousand dollars, in the theater property; that is to say, an undivided interest equivalent to a fraction of which thirty thousand is the numerator and a number equal to the number of dollars which represent the value of the theater property, when distributed, is the denominator. This, because the testator had power to dedicate to charity, not merely one third of the theater property, but one third of all the property of which he had the power of disposition.

After the fifteen specific legacies are paid, the trustees will be entitled to retain, subject to the charitable uses, the legal title to an undivided interest in the theater property equal to one third of what remained of all the property after deducting debts and expenses—one third of what was distributed. If one third of the value of the estate distributed shall be less than the value of the theater property—its value as of

the date of the decree of distribution being ascertained—the trustees will hold the remainder in trust for appellant.

The precise pecuniary value of the interests of the trustees and appellant can not now be determined here: First, the costs of administration are not shown by the transcript; second, the transcript does not clearly show but claims have been allowed other than the thirty-seven thousand five hundred dollar mortgage, the only claim which distinctly appears to have been allowed; third, the transcript does not show the value of the distributable assets when distributed.

If the theater property shall be "capitalized" as provided in the will, the rights of the trustees and residuary legatee in the fund will be proportionately the same as their rights in the property.

XIV. Modification of decree in the Court below.

The decree must be reversed, with direction to the Superior Court to modify it so as to accord with the views herein last above expressed.

The decree must be limited to defining the rights of the respective parties in the trust estate. As was said by the learned Judge of the Probate Court: "It is, under our system, the necessary province of a Probate Court to inquire and determine whether a valid trust has been created. The mode of administering, the power to regulate and direct its subsequent administration, is quite separate and distinct from a question of whether a legal trust has been expressed. * * * Section 1665, Code Civ. Proc., provides that 'the Court must proceed to distribute the residue of the estate among the persons who by law are entitled thereto.'" With this view of the learned Judge, we are in full accord. We may add that it is within the province of the Probate Court to define the rights of all who have legally or equitably any interest in the property of the estate, *derived from the will,* whether they are entitled to any present enjoyment, or their interests are contingent. If, when the specific legacies shall be paid, the appellant here shall be entitled to a conveyance of any portion of the theater property under the principles announced in the probate decree, and a conveyance shall be denied by the trustees, a Court of Equity will be amply competent to enforce it.

Judgment reversed, and cause remanded with direction to the Court below to modify the decree so as to accord with the views herein expressed.

Ross, J., MORRISON, C. J., McKEE, J., SHARPSTEIN, J., and THORNTON, J., concurred.